Jackson *et al. v.* Stanfield *et al.*

No. 16,164.

JACKSON ET AL. *v.* STANFIELD ET AL.

TORT.—*Damages.*—*Injury to One's Business.*—*Injunction.*—*Retail Lumber Dealers' Association.*—*Broker.*—J. was a broker engaged in buying and selling lumber. D. & S. were lumber dealers at the same place, and were members of "The Retail Lumber Dealers' Association of the State of Indiana," the object of which association was to restrict the liberty of wholesalers to sell to consumers and brokers, the rules of which association the wholesalers must obey or lose their trade, of which association wholesalers may become honorary members, and of which the "West Michigan Lumber Company" was an honorary member. J. had for some time, as such broker, been dealing with the "West Michigan Lumber Company," of which company he could most cheaply and profitably buy, when, on account of a sale of a bill of lumber through J. as broker, such company was compelled by D. & S. to pay to them a fine of $100 for violating the rules of the lumber dealers' association, and on account of such fine, and on account of threats by D. & S. to enforce the rules of such association against such company for further violations of its rules, said lumber company refused to sell through J., by reason of which refusal J. lost a contract of sale of two million feet of lumber, on which his commission would have been $500, and was afterward compelled to make his order through S. & J., a firm of regular dealers, and was compelled to pay such firm $83 for such use of their name; and, by reason of such threats by D. & S., J.'s business as such broker has become greatly depressed and ruined.

*Held,* that D. & S. were liable to J. in damages ($583) for losses in his business, on account of the unlawful conduct of D. & S. in enforcing, and threatening to enforce, the rules of said association.

*Held,* also, that J. was entitled to an injunction perpetually enjoining D. & S. from in any way, other than fair, open competition, interfering with J. in his business, and from making a claim against any one, under the by-laws of said association, who may sell to J., or through him to a consumer.

SAME.—*Injury to One's Business.*—*Damages.*—*Injunction.*—Where the policy pursued against a trade or business is of a menacing character, calculated to destroy or injure the business of the person so engaged, either by threats or intimidation, it becomes unlawful, and the person inflicting the wrong is amenable to the injured party in an action for damages; and a continuation of such injuries may be enjoined.

Jackson *et al. v.* Stanfield *et al.*

SAME.—*Injury to One's Business.—Evidence.—Probable Profits.*—Probable profits which might have been received, not remote or speculative, are admissible in evidence, not as the measure of damages, but to aid the jury in estimating the damages.

STATUTE OF FRAUDS.—*Defense of a Personal One.—Third Parties.*—The defense of the Statute of Frauds is purely a personal one, and a third person (or stranger) can not make such statute available to overthrow a transaction between other persons.

Opinion on petition for rehearing by DAILEY, J.

From the St. Joseph Circuit Court.

*L. Hubbard* and *A. L. Brick,* for appellants.
*A. Anderson* and *J. DuShane,* for appellees.

DAILEY, J.—This is an action brought by the appellants against the appellees for damages and for relief by injunction, on the ground that the defendants had entered into an unlawful combination for the purpose of injuring the appellees in their business, and that, in consequence thereof, plaintiffs had suffered actual damage, and were threatened with great loss in their business.

By request of the parties, the court below made a special finding of the facts, and stated its conclusion of the law thereon, that the plaintiffs were not entitled to recover.

There was no motion for a new trial, and the only questions presented by the record are these:

First. Whether the plaintiffs are entitled to an injunction.

Second. If not entitled to an injunction, are they entitled to recover damages?

It appears from the special finding, that the complainants are husband and wife. Appellant Newton Jackson had no means, but his wife had some property of her own. For several years prior to the commence-

ment of this suit, the husband had been engaged in the business of buying and selling lumber, dealing with his wife's means, and also on commission, acting as a broker without owning the lumber himself. The business was managed by Jackson in his own name, he occasionally affixed the word "agent" to his transactions. He employed from $3,000 to $4,000 of his wife's money, but it was not generally known that he was acting as agent for his wife.

The defendants were partners in the business of selling lumber at retail at South Bend, Ind., and for a number of years kept a lumber yard at that place. Prior to 1889, the defendants and about one hundred and fifty other retail dealers in lumber organized an association under the style name of "The Retail Lumber Dealers' Association of Indiana," and adopted a constitution and by-laws for its government. The constitution declares that the organization was formed "to protect its members against sales by wholesale dealers and manufacturers to consumers."

We have, for convenience, taken so much of the special finding as we deemed material to the questions involved:

"That the plaintiffs, Newton Jackson and Martha E. Jackson, are husband and wife; that Newton Jackson has no means; that his wife has means of her own, and for the past three (3) years Newton Jackson has been engaged in the business of buying and selling lumber; that he has bought and sold lumber, dealing with his wife's means, and also on commission, by negotiating sales as agent of a wholesale dealer or manufacturer, and receiving a commission therefor, without owning the lumber himself; that the arrangement between plaintiffs was that the husband supported himself and family from

his earnings and profits, and if any surplus remained it was the property of his wife.

"That the business was managed solely by Newton Jackson, in his own name, he occasionally using the word 'agent' in connection with his own name, and using from $3,000 to $4,000 of his wife's means; but defendants had no knowledge that he was acting as agent for his wife.

"That plaintiffs have kept no lumber yard or stock on hand in South Bend, Indiana, where they have done business for the past three (3) years.

"That the defendants are partners, retail dealers in lumber, in South Bend, Indiana, and have kept a lumber yard and stock on hand.

"That prior to 1889, the defendants and other retail dealers in lumber in Indiana, about one hundred and fifty (150) in number, associated themselves together into an association known and designated as the Retail Lumber Dealers' Association of Indiana, and agreed to a constitution and by-laws for their government, which constitution and by-laws are in these words:

## "CONSTITUTION.

### "ARTICLE I.—TITLE.

"The title of this organization shall be 'The Retail Lumber Dealers' Association of the State of Indiana,' and it shall have for its object the protection of its members against sales by wholesale dealers and manufacturers to consumers, and the giving of such other protection as may be within the limits of co-operative association.

### "ARTICLE II.—CONDITIONS OF MEMBERSHIP.

"Any person who may be regularly in the retail lumber trade, owning or operating a lumber yard, in which a general assortment of stock in kind and quantity commensurate with the demands of the community where

located, is kept for sale, may become a member of this association by subscribing to the constitution, and paying the annual dues prescribed by the by-laws.

"ARTICLE VII.—WHEN MEMBERSHIP SHALL CEASE.

"When any member or firm shall cease to keep a regular assortment of lumber, as set forth in article II, he or they shall cease to be members of this association.
\* \* \* \*

### "ARTICLE IX.

"Any manufacturer or wholesale dealer may become an honorary member of this association, with all privileges and benefits save that of voting, upon payment of the annual dues. *Provided,* That all such members who may violate the rules thereof shall be immediately dropped from the rolls.

### "ARTICLE X.

"Any manufacturer or wholesale dealer may become an honorary member of this association, with all the privileges and benefits save that of voting, upon payment of the annual dues.

"Section 5. Members are entitled to the protection of this association in the towns in which their yards are situated, and the adjacent territory, which must be designated in the application for membership, and written in the membership certificate. If protection is wanted for more than one point (where applicant owns or operates a yard), separate memberships must be taken.
\* \* \* \*

### RELATIONS WITH WHOLESALERS.

"Section 3. Whenever, and as often as any manufacturer or wholesale dealer, or their agents, shall sell lumber, sash, doors or blinds to any person not a regular dealer, as contemplated by article 2 of the constitution of the association, any member doing business in the town to which such shipment was made, may notify

the shipper, manufacturer, or wholesale dealer who made such shipment, that he has a claim against them for such shipment. If the parties can not adjust the claim, it shall be the duty of the member to notify the secretary of the facts in the case, who shall refer the case to the executive committee, whose duty it shall be to hear both sides of the question and determine the claim. If the wholesaler or manufacturer refuses to abide by the decision of the executive committee, it shall be the duty of the secretary to notify the members of this association of the name of such wholesaler or manufacturer. It shall also be the duty of the members to no longer patronize said wholesaler or manufacturer. If any member continues to deal with such dealer or manufacturer, he shall be expelled from the association. If the member refuses to abide by the decision of the executive committee, his name shall be stricken from the membership of the association. It is provided that nothing in this section shall be so construed as to entitle members to make complaint on account of lumber sold to manufacturers, and actually used in articles manufactured, nor to railroad or transportation companies, nor in case of sash, doors, or blinds to hardware merchants who keep a regular stock of such goods.    *    *    *    *

POWERS OF EXECUTIVE COMMITTEE.

"Section 7. The president and secretary, *ex officio,* are constituted the executive committee of this association. In all matters relating to claims made by this association, between the sessions of the board of directors, the said committee shall have the same powers as those conferred upon the said board of directors; that upon request of the secretary said committee shall convene to determine and adjudicate such matters as are not clearly defined by the constitution and by-laws, or such other questions as he deems of great importance to the associ-

ation. Any wholesaler not satisfied with the decisions of the secretary in cases in which demands are made upon him, may appeal to the executive committee, whose decision shall be final. * * * *

"That said constitution and by-laws were published in May, 1888 and 1890, together with lists of active members, wholesale members and honorary members; said active members appearing to be doing business in Indiana, and wholesale and honorary members appearing to be doing business in Indiana, Illinois, and Michigan, and other States.

"That such publications were made in pamphlet form, and a copy of each such pamphlet was sent to every member of the association, and to all retail dealers in Indiana, and to all wholesalers and manufacturers of lumber in the United States, a list of whose names and addresses was in the possession of the secretary of said Retail Lumber Dealers' Association.

"That the usual course of proceedings of such association was in case of complaint by any member against a wholesale dealer for a violation of its rules, that a hearing was had, and the person or firm charged was heard before a committee of said association, and if a penalty was assessed by such committee, and such penalty was not paid, a notice was to be sent to each member of the association upon a blank kept to be used for that purpose, which blank embraces section 3 of the foregoing by-laws, and each member is notified that ———, dealer of ——— town, wholesaler, has sold a bill of lumber to some certain party who is not a regular dealer as contemplated, and refuses to adjust the same.

"That said association has in this manner adjusted all claims that had come before it. That the objects of said associations have thus far been made effective; and it is

still in full force, and there is no probability of its discontinuance at present.

"That the defendants, Stanfield and Dresden, have been members of said association for the past three years; and the defendant, Stanfield, became a director of said association, at its December meeting, in 1889, for a term of two years, and is still such director.

"That in October, 1889, the Birdsell Manufacturing Company of South Bend, Indiana, desired to purchase a large bill of lumber, and Newton Jackson and the defendants were competitors in the sale of such lumber, and said Jackson was successful in making such sale, and acting as a broker bought such bill of lumber of the West Michigan Lumber Company of Woodville, Michigan, and the said bill of lumber was shipped directly by the West Michigan Lumber Company to said Birdsell Manufacturing Company, and a commission on such sale was paid by said West Michigan Lumber Company to Newton Jackson.

"That defendants thereupon wrote and sent to said West Michigan Lumber Company the following letter:

"SOUTH BEND, IND., Oct. 28, 1889.

"*West Michigan Lumber Company, Woodville, Mich.:*

"GENTLEMEN—We have bought lumber of your house for a number of years past, and considered you an honorable, upright company, doing a strictly wholesale business; but recently we are informed that you have infringed upon the laws of the Lumbermen's Association of the State of Indiana, by selling to a consumer in this city a large bill of lumber, thus coming in competition with ourselves in the retail trade. We trust that you can satisfactorily explain this matter, and we will not be obliged to lay it before the State Board. We refer to the Birdsell bill. Yours, etc.,

"DRESDEN & STANFIELD.

"To which letter the West Michigan Lumber Company sent the following answer:

"WOODVILLE, MICH., Oct. 31, 1889.
*"Dresden & Stanfield, South Bend, Ind.:*

"GENTLEMEN—Replying to your letter of the 28th, the bill to which you refer was sold through a regular dealer in your city, and he was paid his commission.

"Your truly,
"WEST MICHIGAN LUMBER Co.

"To which letter defendants replied as follows:

"SOUTH BEND, IND., Nov. 5, 1889.
*" West Michigan Lumber Co., Woodville, Mich.:*

"GENTLEMEN—Your favor of October 31 received. Contents noted. We are credibly informed that your house sold the Birdsell bill to Newton Jackson of this city. According to article II of the constitution of the Retail Lumber Dealers' Association of Indiana, Newton Jackson is not a regular dealer. There is and has been for the past year "too" much encroaching by wholesalers upon "the" natural and acquired rights of retailers; consequently you should not think us impertinent upon insisting that you give us the name of the regular dealer to whom you sold the bill for Birdsell's use.

"We are determined to sift this matter to the bottom.

"Yours, etc.,     DRESDEN & STANFIELD.

"And said West Michigan Lumber Company replied as follows:

"WOODVILLE, MICH., Nov. 8, 1890.
*"Messrs. Dresden & Stanfield, South Bend, Ind.:*

"GENTLEMEN—Replying to your letter of 5th, we sold the bill mentioned through Mr. N. Jackson. As he bought the lumber from us, we supposed he was a regular dealer.

"We do not intend to sell except through a regular dealer, and so supposed when the order was accepted.

"Yours truly.

"WEST MICHIGAN LUMBER COMPANY.

"And then, on November 13, the defendants sent the following letter to said West Michigan Lumber Company:

"SOUTH BEND, IND., Nov. 13, 1889.

"*West Michigan Lumber Co., Woodville, Mich.:*

"GENTLEMEN—Yours of the 8th is before us. Ignorance of the law is no justification. N. Jackson has not now,.nor has he had for at least three years, either office or yard in South Bend. He has been, and is, a notorious scalper.

"We demand of you one hundred dollars ($100) on account of the Birdsell bill. If you refuse the demand, we shall refer our claim to Retail Dealers' Association of Indiana, of which you are honorary members, and discover if it has a power in the land, or merely the hollow mockery of a resounding name.

"Yours, etc.,   DRESDEN & STANFIELD.

"That the West Michigan Lumber Company thereupon sent the following letter to defendants:

"WOODVILLE, 11–19, '89.

"*Dresden & Stanfield, South Bend, Ind.:*

"GENTLEMEN—Yours of the 13th inst. at hand. In regard to that demand for one hundred dollars ($100) on account of Birdsell Manufacturing Company's bill, we shall have to respectfully decline for that reason. If you, or the dealers of South Bend, sold the Birdsell Manufacturing Company one-half, or most, of the white pine lumber they bought, it would be different; but they write that they bought from the wholesale trade over one million feet per year, and did not buy over five thousand feet from the concerns there. Now, it does not look to us that you should have any claim against this company.

If you have, there are others in the same fix as us, and you should make claim on all. We have always been very particular not to interfere with the retail trade, and in the past ten years have had no complaint.

"Hoping you will look into the matter fully before making complaint, I am    Yours truly,

"E. B. WRIGHT, President.

"That these defendants wrote and sent the following letter to W. B. Allen, secretary of said association, at Indianapolis, Ind.:

"SOUTH BEND, IND., Nov. 22, 1889.

"*To the Executive Committee of the Retail Lumber Dealers' Association of Indiana:*

"GENTLEMEN—We herewith enclose correspondence, and submit to you our claim against the West Michigan Lumber Company, of Woodville, Michigan. About two months ago the Birdsell Manufacturing Company, of South Bend, wishing to enlarge their factory, gave us a bill of material to figure on, consisting of joists, timbers, flooring, and boards, amounting to 326 M. feet, with privilege of increasing 400 M. feet, which was afterwards done. The West Michigan Lumber Company got the contract through Newton Jackson, a man without an office or yard, whom the railroad companies would not trust one day for freight, really a buyer for the Birdsell Manufacturing Company. The West Michigan Lumber Company shipped direct to Birdsells'. Mr. Wright, in his favor of the 19th, claims that the Birdsells purchased a million feet of lumber every year of the wholesalers, and not five M. feet of the retailers; but he fails to state that this million feet is for manufacturing wagons and clover hullers. There are no more complete stocks carried in Indiana, outside of Indianapolis, than are ours. There are two other yards in our city nearly as complete. Why do buyers go away from here to buy? Because they can

get cheaper from wholesalers than from home concerns. In this case the West Michigan Lumber Company undoubtedly sold the lumber to the consumers cheaper than they quoted it to us. We, and our predecessors in this location, have for years done business with the West Michigan, the last purchase slightly over two months ago. We have never had any trouble, always finding them honorable and upright. We entertain no malice against the company, but we do insist that, as members of the Retail Lumber Dealers' Association, we are entitled to our claim against the West Michigan Lumber Company, who are honorary members of the same association, and if there is any strength in the association we will be righted. If the association can not enforce its laws, the sooner it gives up the ghost the better.

"Yours truly, DRESDEN & STANFIELD.

"That thereafter a hearing of such claim was had before a committee of said association at Indianapolis, in December, 1889, and said committee found that the said claim of defendants against the West Michigan Lumber Company was valid.

"And on February 20, 1890, W. B. Allen, secretary of the association, wrote and sent the following letter to said West Michigan Lumber Company:

"INDIANAPOLIS, IND., Feb., 20, 1890.

"*W. B. Wright, Esq., President West Michigan Lumber Company*:

"DEAR SIR—January 27th I wrote your Mr. J. S. Wright that the final decision in regard to South Bend matter was that claim of Dresden & Stanfield is valid, and they are entitled to redress. I wrote J. S. Wright, as he seemed to have the settlement of the claim in his hands; but as I have had no reply since I wrote him, will you kindly advise me what your final answer is in regard to this?

"I enclose copy of letter of January 27th.

"Yours truly,    W. B. ALLEN, Secretary.

"And on April 14, 1890, said West Michigan Lumber Company wrote and sent the following letter to said secretary:

"WOODVILLE, MICH., April 14, 1890.

"*W. B. Allen, Esq., Secretary Retail Lumber Dealers' Association, Indianapolis, Indiana:*

"DEAR SIR—Your favor of the 10th at hand.    Please make a full statement of the claim and demand of Dresden & Stanfield, also a statement that the claim was allowed by the Retail Lumber Dealers' Association on the grounds that the West Michigan Lumber Company could sell lumber direct to the Birdsell Manufacturing Company, but when sold through N. Jackson they must pay damages, which we believe is correct.

"Yours truly,    WEST MICHIGAN LUMBER CO.

"To which said secretary replied as follows:

"INDIANAPOLIS, IND., April 17, 1890.

"*West Michigan Lumber Company, Woodville:*

"GENTLEMEN—In regard to complaint of Dresden & Stanfield, would say that above named firm filed a complaint against your company for selling lumber to party or parties that are not dealers, or who are entitled to buy lumber of a wholesaler or manufacturer. This claim was investigated by the executive board of Retail Lumber Dealers' Association.    Your firm was allowed representation during the investigation, your letters also admitted the sale, and while we thought and still think it was your intention to make the sale through a *bona fide* dealer, still the facts go to prove, and are admitted by yourself, that it was not sold through a regular dealer; and the board had no alternative but to find in accordance with the rules of the association.    The Birdsell Manufacturing Company had nothing to do with the case, and we have

not been called on to decide whether you have the right to sell Birdsell Manufacturing Company or not. The plain facts are, you sold this bill to N. Jackson, which was so stated in your own correspondence. Mr. Jackson is not a lumber dealer, as defined by our rules, namely, a person or firm who carry a stock adequate to the market where he or they are located. We submit to your own judgment that we are forced to deny Mr. Jackson's right to buy lumber of any one that he pleases, and throw down all the bars, as he could then sell to any one, and we would have no way of reaching him. Mr. Jackson's class is one that does more injury to the yards of this country than any that we have to deal with.

"Very truly,	W. B. ALLEN, Secretary.

"That therefore, on April 30, 1890, the West Michigan Lumber Company sent its draft for one hundred ( $100 ) dollars to said Retail Lumber Dealers' Association of Indiana, and said sum was by said association passed over to defendants in payment of said claim against the West Michigan Lumber Company, which sum was paid and received as a penalty for a violation of the rules of said association in the sale of the Birdsell bill of lumber through N. Jackson.

"That therefore, the said West Michigan Lumber Company, and Morton, Lewis & Co., of Grand Rapids, Michigan, refused to sell lumber to said Newton Jackson for the reason that said West Michigan Lumber Company and said Morton, Lewis & Co., who were wholesale dealers and manufacturers of lumber, were afraid of penalty for violation of the rules of said association.

"That said Newton Jackson made an offer to the Studebaker Bros. Manufacturing Company of South Bend, to sell two million feet of lumber to said company, which offer was based on the price-lists of said West Michigan Lumber Company, and said Jackson could not obtain

said lumber of any other firm as cheaply and conveniently as from said West Michigan Lumber Company. That this commission therein would have been five hundred dollars ($500). That the offer of said Jackson was accepted by said Studebaker Bros. Manufacturing Company, but the West Michigan Lumber Company refused to sell to or through said Jackson by reason of the rules of said association, and on account of having paid said penalty; and said Jackson thereupon did not contract with said Studebaker Bros. Manufacturing Company, but turned over such sale to said West Michigan Lumber Company, and allowed said company to make such sale without paying any commission to him.

"That the market from which dealers in South Bend, Indiana, can best and most cheaply buy lumber of wholesalers and manufacturers to resell to consumers is in the State of Michigan, and said Jackson could most cheaply and profitably buy lumber and sell on commission by dealing with wholesale dealers in Michigan, and most cheaply and profitably buy of the West Michigan Lumber Company to resell, and to resell on commission.

"That said Newton Jackson thereafter caused lumber to be purchased for his customers in the name of Smith & Jackson, a firm of regular dealers, as defined by said association, in South Bend, and paid to Smith & Jackson a share of his commission for the use of their names by an agreement with them and paid to them, for that purpose, the sum of $83; which sum was a fair charge for the use of their names.

"That by reason of the refusal of the said West Michigan Lumber Company, to sell him lumber to fill an existing contract, said Jackson went to Manistee, Michigan, to purchase lumber, and expended in railroad fare and freight ($82) more than it would have cost him had the West Michigan Lumber Company not refused to sell

to him; that, except for such refusal, the West Michigan Lumber Company could have sold him lumber to fill such contract.

"That, during the year 1890, plaintiffs, business has decreased; that before the commencement of this suit, plaintiffs requested of defendants to permit plaintiffs to do business as heretofore, and to abandon their position in this matter, and not to complain to said association of sales made to plaintiffs, but defendants refused to, and declared their intention to adhere to their position, and that they intend to enforce the rules and by-laws of said association.

"That defendants and the West Michigan Lumber Company, prior to and at the time of the happening of the matters in controversy aforesaid, were members of said association — defendants as active members, said company as an honorary member, and both defendants and said West Michigan Lumber Company knew its purposes and objects.    *    *    * "

We infer, from article 2 of the constitution, that "any person, in the retail lumber trade, owning and operating a lumber yard in which a general assortment of stock in kind and quantity, commensurate with the demands of the community where located, is kept for sale, is a regular dealer."

The regular dealer, in accordance with the provisions of section 3 of the by-laws, when his territory is encroached upon by a wholesale dealer or manufacturer is authorized to notify the person so offending that he has a claim against him for such sale or shipment and to make a demand therefor. If the parties can not adjust it, it is made the duty of the member to notify the secretary of the facts in the case, who shall refer the matter to the executive committee, whose duty it is to hear the grievances and determine the claim. If the wholesaler

or manufacturer ignores the decision of the committee, it is the duty of the secretary to notify the members of the association of the name of the person so offending and of the members to no longer patronize him. If they continue to deal with the offender they shall be expelled from the association, and if any member refuses to abide by the decision of the executive committee his name is to be stricken from the membership of the society.

The facts found by the court disclose that the appellees, as members of the combination complained of, availed themselves of the means provided for in section three to destroy the business of the appellants as brokers in lumber, because they were not retail dealers within the definition of the term, and that they effectuated their purpose.

The special findings of fact clearly show it to be a compact to suppress the competition of those dealers who did not own yards, with an adequate stock on hand, by driving them out of business. By this plan they reach the wholesale dealer, and compel him to pay an arbitrary penalty under a threat of financial injury, and they force him to assist in ruining the dealer who does not own a yard.

There is such an element of coercion and intimidation in the by-law under consideration, towards the wholesale dealers, manufacturers, and even the members of the society, and such provision made for penalties and forfeitures against them, that it will not do to say it was optional with the wholesale dealer whether it would pay the demand or not, or that it was left to the discretion or choice of the members to either trade with the wholesaler or abandon the association. A conspiracy formed and intended directly or indirectly to prevent the carrying on of any lawful business, or to injure the business of any one by wrongfully preventing those who would

Jackson *et al. v.* Stanfield *et al.*

be customers from buying anything from the representatives of such business, by threats or intimidation, is in restraint of trade and unlawful.

Under a statute of Massachusetts, "a combination to restrain trade, so as to impoverish a man in his business, is indictable." 4 Am. and Eng. Encyc. of Law, p. 608, citing note 3. On the same page it is said: "The labor and skill of the workman, the plant of the manufacturer, and the equipment of the farmer, are, in an equal sense, property. Every man has a right to employ his talents, industry, and capital as he pleases, free from the dictation of others; and, if two or more persons combine to coerce his choice in this behalf, it is a criminal conspiracy, whether the means employed are actual violence, or a species of intimidation that works upon the mind. While the law accords this liberty to one, it accords a like liberty to another; and all are bound to use and enjoy their own liberties and privileges with regard to those of their neighbors."

In *People* v. *Petheram* (Mich.), 7 West. Rep. 592, it is said: "No one is authorized to unlawfully destroy or hinder the lawful business of another for the purpose of helping himself."

In 1 Hawkins, P. C., ch. 72, section 2, it is laid down that "all confederacies whatsoever, wrongfully to prejudice a third person, are highly criminal at common law." The same proposition, in various forms of expression, is declared in a long list of authorities cited in 4 Am. and Eng. Encyc. of Law, 609. So that, as the author states it, "we are compelled to forsake the literature of doubt, and do cleave unto that of authority."

It is held in *State* v. *Stewart*, 59 Vt. 273, S. C. 4 New Eng. Rep., that "such conspiracies may give the indi-

VOL. 137—39

vidual directly affected by them a private right of action for damages.''

In *Walker* v. *Cronin*, 107 Mass. 555 (564), it is said that ''every one has a right to enjoy the fruits and advantages of his own enterprise, industry, skill and credit. He has no right to be protected against competition; but he has a right to be free from malicious and wanton interference, disturbance or annoyance. If disturbance or loss come as a result of competition, or the exercise of the like rights by others, it is *damnum absque injuria.*''

In *Carew* v. *Rutherford*, 106 Mass. 1 (14), it is said: ''Every man has a right to determine what branch of business he will pursue, and to make his own contracts with whom he pleases and on the best terms he can.'' ''He may refuse to deal with any man or class of men. And it is no crime for any number of persons, without any unlawful object in view, to associate themselves together and agree that they will not work for or deal with certain men or classes of men, or work under a certain price, or without certain conditions.''

And, in *Commonwealth* v. *Hunt*, 4 Met. 111 (134), Shaw, C. J., declares that the legality of such association will depend upon the means to be used for the accomplishment of its objects, and whether they be innocent or otherwise.

In *More* v. *Bennett*, 140 Ill. 69, the court held that a combination or conspiracy entered into by a stenographic association, by which the prices of reporting legal proceedings by shorthand are to be kept up by the prevention of competition, although such association may embrace but a comparatively small part of the reporters engaged in the business, but which is open for the admission of all reporters who may be induced to join, and by which a schedule of prices is fixed, and by which any member violating its rules as to prices is subject to a

fine, is void, as tending to prevent a free and unrestricted competition in business.

In *Lovejoy* v. *Michels,* 88 Mich. 15, the court held that where the price of goods is not agreed upon at the time of the sale, the law implies an understanding to pay what the commodity is reasonably worth; that a price arbitrarily fixed by a combination of manufacturers or dealers is not competent evidence to show a reasonable price for the goods sold by the members of the combination; that such combinations are intended to stifle competition, which is a stimulus of commercial transactions, and to substitute that of unconscionable gain, whereby the participants become enriched at the expense of the consumer, beyond what he ought to pay under a healthy spirit of competition in the business community. The effect of such combinations is the same as that in restraint of trade, and public policy places its reprobation alike upon both. Combinations to control prices are against public policy, and void, because they have a mischievous tendency, and are injurious to the best interests of the State, which require that all legitimate business shall be open to competition; that the current price of commodities shall be controlled by the law of supply and demand; that the laws of commerce shall flow in their accustomed channels, and not be diverted by combinations to control prices fixed by the arbitrary decision of interested parties.

In *Texas Standard Cotton Oil Co.* v. *Adoue,* 19 S. W. Rep. 274, the court held that "every producer or vendor of" commodities "has the right to use all legitimate efforts to obtain the best price for the articles in which he deals. But when he endeavors to artificially enhance prices by suppressing or keeping out of the market the products of others, and to accomplish that purpose by means of contracts binding them to withhold their sup-

ply, such arrangements are even more pernicious than combinations not to sell under an agreed price. Combinations of that character have been held to be against public policy, and illegal. If they should be sustained, the prices of articles of pure necessity, such as coal, flour, or other indispensable commodities, might be artificially raised to a ruinous extent, far exceeding any naturally resulting from the proportion between supply and demand."

In Greenhood on Public Policy, 651, the rule is stated: they may combine for the purpose of obtaining a benefit for themselves which, by law, they can claim. "But a combination for the purpose of injuring another is a combination of a different nature, directed personally against the party to be injured; and the law allowing them to combine for the purpose of obtaining a lawful benefit to themselves gives no sanction to combinations which have for their immediate purpose the hurt of another."

In *Delz* v. *Winfree* (Tex.), 16 S. W. Rep. 111, the defendants were wholesale dealers in slaughtered meats, and combined to refuse to sell meat to the plaintiff, a butcher. This was not sufficient; but the petition also alleged that the defendants also induced another dealer in slaughtered meat to likewise refuse to sell to the plaintiff. It was held that such interference with his business was a cause of action, and it was error to sustain a demurrer to the petition.

In *Murray* v. *McGarigle*, 34 N. W. Rep. 522, the complaint alleged a conspiracy to control the coal trade in Milwaukee, Wis., and, as a result, an injury to plaintiff in his business and reputation. The complaint is set out in full and held good for civil damages.

In *Buffalo Lubricating Oil Co.* v. *Standard Oil Co.*, 12 N. E. Rep. 825, the latter threatened plaintiff's custom-

ers with suits for infringement of its patents, depreciated its oil, etc. The object was to drive plaintiff out of business. It was held that the Standard Oil Co'. was liable for damages.

The great weight of authority supports the doctrine that where the policy pursued against a trade or business is of a menacing character calculated to destroy or injure the business of the person so engaged, either by threats or intimidation, it becomes unlawful, and the person inflicting the wrong is amenable to the injured party in a civil action for damages therefor. It is not a mere passive, let-alone policy; a withdrawal of all business relations, intercourse, and fellowship that creates the liability, but the threats and intimidation shown in the complaint.

The learned counsel for the appellees, in their very able brief, contend that the plaintiffs were only incidentally injured by the acts of the defendants in enforcing a penalty of $100 against the West Michigan Lumber Company.

It will be observed that the Retail Lumber Dealers' Association invites wholesalers to become honorary members, and that said lumber company is an honorary member. But the rules of the association do not affect alone members, active and honorary. They extend to and reach any wholesale dealer in the United States with whom the threat to withdraw the trade of 150 retail dealers can have weight.

It is shown in the finding that Michigan is the source from which most of the lumber in Northern Indiana is procured, and that the rules of the association are published in pamphlet form and s. to every wholesale dealer in the United States. The retail dealers who organized the association in question, are members of the various cities and towns where they are located. They have lumber yards containing stock in quantity and

quality suited to and commensurate with the wants of the consumers in their several localities. These gentlemen are prominent, wealthy, and influential citizens of our State, whose power, from the elevated stations they occupy, so exercised, enables them to control the wholesale dealers of the United States against the agents and brokers within their own territory, and effectually drive them out of business. It is idle to say that the victim of such a combination is only "incidentally" affected thereby. The object of the association, and the result attained, is a monopoly of the trade by owners of yards, and the broker is simply ignored by the wholesale dealers.

It is not in point to cite cases where men voluntarily agree to observe rules adopted by themselves. This is no voluntary affair of the wholesale dealers. It is not even a combination of wholesalers. They may, and do, sometimes become honorary members, so as to keep within touch of the retail dealers and secure trade. It is, as stated, an association of retailers to restrict the liberty of wholesalers to sell to consumers and brokers, and the wholesalers must obey or lose their trade.

It is found, as a fact, that the market in which the plaintiffs could most profitably buy was in Michigan. Freight and railroad facilities necessarily limited the field.

It is also found that the West Michigan Lumber Company is the dealer that made the plaintiffs' trade most profitable, and that, for fear of the penalties, this company and another refused to deal with them. The West Michigan Lumber Company was willing and anxious to sell to the plaintiffs until fined by the defendants and mulcted in the sum of one hundred dollars, when it refused to make further sales for the reason that it was afraid of the penalties. Such rules contravene the rights of non-members to earn their living by fair competition.

The case of *Bohn Mfg. Co.* v. *Hollis*, 54 Minn. 223, decided by the Supreme Court of Minnesota, July 20, 1893, which will be found in volume 55 N. W. Rep., at p. 1119, is cited by appellees as sustaining the decision of the lower court. It was a case in which a large number of lumber dealers had formed an association very similar in its character to the one in the case at bar. The plaintiff had made a sale of lumber directly to a consumer, and the secretary made a demand upon him for the penalty, as provided in section 3 of the by-laws. The plaintiff delayed and evaded payment so long that defendants threatened to send all the members of the association the lists of notices provided for by section 6 of the by-laws, informing them that the plaintiff refused to comply with the rules of the association, and was no longer in sympathy with it. Thereupon the plaintiff commenced his action for a permanent injunction, and obtained, *ex parte*, a temporary one, enjoining the defendants from issuing these notices, etc. The appeal was from an order refusing to dissolve the same. On appeal the court found that the action would not lie, and that the injunction should be dissolved, although the defendants were demanding and seeking to recover the penalty by threats, and if these notices should be issued the members of the association would thereafter refuse to deal with the plaintiff, thereby resulting in loss to it of gains and profits. The opinion proceeds upon the theory that there was no element of coercion or intimidation in the acts complained of, but we think the decision in this respect is in conflict with approved authority, and is bad as a precedent.

It appears from the facts found by the court, that after the payment of the $100 fine so assessed, the appellant Newton Jackson made an offer to the Studebaker Brothers Manufacturing Company of South Bend, to sell said company two million feet of lumber, which offer was based on

the price-list of the West Michigan Lumber Company; that his commission thereon would have been $500; that the offer of said Jackson was accepted by the Studebaker Brothers Manufacturing Company, but the West Michigan Lumber Company refused to sell to or through Jackson by reason of the rules of said association, and on account of having paid said penalty, and said Jackson thereupon did not contract with said Studebaker Brothers Manufacturing Company, but turned over such sale to the West Michigan Lumber Company, and allowed it to make such sale without paying any commission to him. That said Newton Jackson thereafter caused lumber to be purchased for his customers in the name of Smith & Jackson, a firm of regular dealers as defined by the association, in South Bend, and paid to them $83 of his commission for the use of their name, which was a reasonable and fair charge therefor. That by reason of the refusal of the said West Michigan Lumber Company to sell him lumber to fill an existing contract, said Jackson went to Manistee, Michigan, to purchase lumber, and expended in railroad fare and freight $82 more than it would have cost him had said West Michigan Lumber Company not refused to sell to him; that except for such refusal, the West Michigan Lumber Company could have sold him lumber to fill such contract. That during the year 1890, plaintiffs' business had decreased, and before the commencement of this suit, plaintiffs requested defendants to permit them to do business as heretofore, and to abandon their position in this matter, and not to complain to the association of sales made to plaintiffs, but defendants refused to do so, and declared their intention to adhere to their position, and that they intended to enforce the rules and by-laws of said association.

Without further extending this opinion, we only need say that if it had not been for the wrongful acts of the

appellees, the plaintiffs would have made $583 in profits upon contracts of which they were deprived. They are entitled, as compensation, to the amount of damages sustained, which is measured by the loss actually incurred. If there was any circumstance to be considered in mitigation of damages it was incumbent on the defendants to show that fact, but, as the record is silent on this question, we must infer that none existed. We think the claim for expenses to Manistee and return too remote to be considered in this case.

The judgment is reversed, with instructions to restate conclusions of law, and render judgment upon the special findings in favor of the appellants for five hundred and eighty-three dollars, and with the further instruction to render a judgment perpetually enjoining the defendants from in any way, other than by fair, open competition, interfering with the plaintiffs in their business, and from demanding a penalty or making a claim against any one, under the by-laws of said association, who may sell to the plaintiffs, or through them to a consumer.

HOWARD, C. J., took no part in this decision.

Filed Feb. 1, 1894.

## ON PETITION FOR A REHEARING.

DAILEY, J.—The learned counsel for the appellees ask that a rehearing be granted for the reason that the conclusion of the court, as rendered in its opinion, should be modified so far as it relates to the assessment of the damages. As suggested, the main subject discussed by counsel on both sides, and considered by the court in its opinion, was whether or not the appellants were entitled to an injunction. Counsel do not seek a change in the decision as to the leading question involved, but insist there is nothing in the special findings of facts, which would justify a judgment in favor of the appellants for the

sum of five hundred dollars commissions claimed to be due Newton Jackson, by reason of an attempted sale of lumber by him to the Studebaker Brothers Manufacturing Company.

It is found and set forth in the original opinion, that Newton Jackson made an offer to said company to sell them two million feet of lumber, which offer was based on the price lists of the West Michigan Lumber Company; that said Jackson could not obtain said lumber of any other firm as cheaply and conveniently as from the firm last named; that his commission thereon would have been $500; that the offer of said Jackson was accepted by the Studebaker Brothers Manufacturing Company, but said West Michigan Lumber Company refused to sell to or through said Jackson by reason of the rules of the association, and on account of having paid a penalty of $100, and thereupon said Jackson did not contract, but turned over said sale to the West Michigan Lumber Company and allowed the company to make the sale without paying any commission to him. In commenting on this finding counsel say:

"The substance of the first part of this finding is that Jackson offered to sell to the Studebakers two million feet of lumber. It does not show what price he was to pay the lumber company, or what price the Studebakers were to pay to him, or what profits he would have made had the proposed contract been carried out. If, as found by the court, he made a straight agreement to sell to the Studebakers a certain amount of lumber, he could not have been entitled to any commision. No dealer can make a commission when he is trading on his own account. If he buys for one price and sells for a higher price he may make a profit, but certainly not a commission. The word 'commission,' as we understand it, means a 'brokerage or allowance made to a factor or agent for the trans-

acting of business for another.' There is nothing in this finding to show that Mr. Jackson was ever acting as agent or broker for the West Michigan Lumber Company, and not being so found, it must be held that he was not the agent or factor of that company. Unless he was such agent or factor, he could not have a commission, and not being such agent or factor he was entitled to none. The finding of the court below must stand as it is written; that is to say, that he himself, on his own account, offered to sell to the Studebakers certain lumber, and it is not found what his profit on the transaction would have been. It may be implied, and very possibly is implied, that if he had made the sale as agent or broker or commission merchant for the West Michigan Lumber Company, then in such case he would have been entitled to a commission for his services. But the fatal defect is this: that it is not found that he was, but on the contrary it is practically found that he was not the agent, broker or commission merchant or factor for the West Michigan Lumber Company. Therefore it matters not what commission he might have made had he been such commission merchant or broker or factor or agent, and sold the lumber as such agent or broker, for the finding is, as we have stated, that he did not sell the lumber as an agent or broker. That finding, if it means anything, means that he sold the lumber on his own account; that he made a contract for a future delivery, but what his profits would have been on the transaction does not appear."

We think the essential fact, found in relation to this matter, was that Jackson's commission or profit—no difference by what name it may be called—would have been $500, had not the West Michigan Lumber Company "refused to sell either to or through him by reason of

the rules of the association, and on account of having paid said penalty.''

It is found that Jackson could most cheaply and profitably buy of the West Michigan Lumber Company, and based his offer on their prices. Appellees cut off this source of supply, and did all they could to exclude him from the market. It matters not whether the $500 would have been commission or profit. The finding calls it a commission, and says, but for the wrong of the appellees, he would have realized this amount in the transaction. The naked fact remains that the loss found to have been sustained is so definite and certain as to leave no room for cavil. It is less speculative than the future earnings of a physician or insurance agent, or the profits of a stallion's services, which may constitute the basis of damages.

It is urged that the contract between the Studebaker Bros. Mfg. Co. and appellant Newton Jackson, is void under the statute of frauds, because the value of the lumber was over fifty dollars, and the finding does not show that the offer was accepted in writing. If this be true, it is no concern of the appellees. Parties to contracts and their privies can alone take advantage of the fact that a contract is invalid under the statute of frauds. Many forms of expression by this and other courts illustrate the doctrine that a third person can not make the statute of frauds available to overthrow a transaction between other persons; that the defense of this statute is purely a personal one, and can not be made by strangers. *Burrow* v. *Terre Haute, etc., R. R. Co.*, 107 Ind. 432; *Bodkin* v. *Merit*, 102 Ind. 293; *Cool* v. *Peters Box, etc., Co.*, 87 Ind. 531; *Dixon* v. *Duke*, 85 Ind. 434; *Wright, Admr.*, v. *Jones*, 105 Ind. 17; *Savage* v. *Lee*, 101 Ind. 514; 8 Am. and Eng. Encyc. of Law, 659, and cases cited.

It concerns the remedy alone, and the modern law is well settled that in the absence of a statutory provision to the contrary, the effect of the statute is not to render the agreement void, but simply to prevent its direct enforcement by the parties, and to refuse damages for its breach. 8 Am. and Eng. Encyc. of Law, 658–9, and cases cited.

Counsel also take the position that the $500 was unearned commission or profit, and hence not recoverable.

In *Niagara Fire Ins. Co.* v. *Greene*, 77 Ind. 590, one cause for a new trial was excessive damages. The appellant contended that the whole verdict was necessarily made up of profits or gains which the appellees might have received, and was, therefore, erroneous, but the court said that probable profits which might have been received, not remote or speculative, have often been allowed in proof, not as the measure of damages, but to aid the jury in estimating the damages.

The evidence is competent as a guide to aid in the exercise of a proper discretion. *City of Logansport* v. *Justice*, 74 Ind. 378; *Fultz* v. *Wycoff*, 25 Ind. 321; *Frenzel* v. *Miller*, 37 Ind. 1.

As a matter of right and justice, and of law, we feel that the conclusion of the court allowing the appellants to recover the $500, for profits or commissions, should not be set aside.

The petition for a rehearing is overruled.

Filed April 6, 1894.