HENRY REEVES, Appellee, v. THE DECORAH FARMER'S COOPER-
ATIVE SOCIETY, OLE ELLINGSON, A. T. HOLTON
and ED. SELLMAN, Appellants.

**Monopolies:** CONTRACTS IN RESTRAINT OF TRADE. All monopoly contracts
and those in restraint of trade and free competition have always been
odious at common law, regardless of their ultimate effect; and gen-
erally any contract placing it in the power of a monopoly to raise
and lower prices is invalid, or one between given individuals by which
they seek to control the price of an article, especially where the article
is one of necessity or in general use.

**Same:** SELLING AGENCIES. A mere selling agency is not a monopoly, either
under the common law or the anti-trust statutes, unless the purpose
of the agency is to create a monopoly.

**Same:** CONTRACTS IN RESTRAINT OF TRADE: VALIDITY. While originally
all contracts in restraint of trade were illegal, the rule now is that
those merely incident to some lawful contract and which are not
unreasonable in character, are not illegal.

**Same.** All contracts or arrangements made to stifle competition are un-
lawful, except where merely incident to another valid contract and
the restraint is not unlawful. But where a co-operative society of
farmers was organized for the purpose of buying, selling and ship-
ping hogs at the local market, with the view of establishing a local
market where they could receive what their hogs were worth, and a
by-law of the society provided that its members and stockholders
should sell their live stock to the society and not to a competitor,
except upon penalty of a certain forfeiture to the society from the
proceeds received from a competition; *Held*, that the agreement un-
der which the society was formed was illegal, because in restraint
of competition, which is to be deemed restraint in trade.

**Same:** INJUNCTION. An individual dealer in live stock may enjoin an
association, organized and acting under an illegal agreement in re-
straint of competition, from competing with him in buying stock in
the local market under the illegal provisions of its organization.

*Appeal from Winneshiek District Court.*—HON. A. N. HOB-
SON, Judge.

THURSDAY, APRIL 10, 1913.

SUIT in equity to enjoin and restrain defendants, their agents, servants, and employees, from demanding, collecting, or receiving any amount whatever under a contract or arrangement entered into between them, which contract, it is claimed, was and is monopolistic in character; invalid, because in restraint of trade; and unfair, because intended to drive all competitors from the market. The trial court granted part of the relief prayed, and defendants appeal. —*Affirmed.*

*C. N. Houck,* for appellants.

*E. R. Acres,* for appellee.

DEEMER, J.—The defendant society is an organization of farmers, incorporated under the general laws of the state for pecuniary profit. Its capital stock is $20,000, $4,000 of which has been subscribed and paid for in cash. The articles of incorporation are not set out in full, but we gather from the record that the society was organized for the purpose of buying, selling, and shipping hogs at the town of Decorah, Iowa. The stock was $10 per share, and at the time of trial there were three hundred and fifty individual stockholders, composed of farmers living in the vicinity of said town of Decorah. At the time this action was commenced the society had been in business for two full years and had purchased 24,628 hogs, paying therefor the sum of $433,628.98. There had been no gains to speak of and no dividends declared, but on December 1, 1910, it had a net gain of $429.

We here quote from the record, the following testimony, showing the nature and purposes of the society:

. . . In conducting the business of the defendant society there is no purpose on the part of its management to

heap up a surplus nor any intention to make a profit in order to distribute a dividend among the stockholders. The directors authorized me at the time I began to buy stock to pay what I could, only just to pay my expenses as I go along and to pay for stock that they would sell after deducting my expenses. That is the policy upon which this society has been conducting its business during its business life. As a matter of fact I have just about met those expenses. The bulk of the stockholders of the defendant society are farmers, just a few who aren't farmers. I would say somewhere about ninety-five per cent. of them are farmers. It is pretty hard to tell as to the percentage, but in the neighborhood of that. Some of the stockholders haven't hogs to sell, but pretty near all of them are producers of hogs; none of the stockholders that I know of are hog buyers other than myself. The purpose of the incorporation of this society was to establish a market where the farmers would receive for their hogs what they were worth here in Decorah. The market at the time the company was incorporated was not considered a good hog market. The society was organized for selling their hogs and buying them, or any farmer who preferred to ship his own stuff could ship it through the company by paying five cents a hundred on hogs shipped or five dollars a car load. The fact of the matter is this society was formed primarily as a selling agency for the members of the society and for the bettering of the market conditions here in Decorah, and that has been its purpose during its entire business life and still is its purpose.

Among other by-laws of the society were the following:

. . . In order to insure future success and prosperity of this society its members and shareholders are required to sell all their marketable produce and live stock to the society. Any member or stockholder who may prefer to sell his produce or live stock to a competitor in this market shall forfeit to the company and pay over to its treasurer, from the proceeds received for produce or live stock so sold to other firms or competitors, the amount as follows: Five cents for every one hundredweight sold to any competitor.

Plaintiff, during the time in question and at the time of the commencement of this action, was a local hog buyer at

the town of Decorah, buying for the Chicago market, and he claims that the defendant society was and is so organized as to drive him from the field; that the members of the society are bound to sell their hogs to the society under the penalty of paying it a forfeit; and that it was organized for the purpose of monopolizing the business at Decorah, and was so operated, not only by and with its members and stockholders, but with strangers, as to force him to pay more than the market price or to get out of business at that place.

One Schoonmaker was plaintiff's agent at Decorah, and the society was represented by defendant Ellingson. Ellingson gave the following testimony with reference to the methods of the defendant society:

. . . Our society buys hogs from its members, and has done so ever since it commenced doing business. There are a large number of farmers in the vicinity of Decorah and adjoining townships who are not members of our association. These farmers are also raising hogs and selling them on the Decorah market. Our society buys hogs from farmers who are not members of the association. Q. And you buy them in competition with Henry Reeves and other buyers? A. I make a bid on the hogs, what I consider them worth. Q. Mr. Schoonmaker is there at the Milwaukee stockyards in Decorah as a representative of Mr. Reeves and is buying hogs in competition with you? A. Yes, sir. Q. You have bought hogs from farmers who are not members of your association at the time Mr. Schoonmaker was bidding on them, have you not? A. Yes, sir. At various times during the last year members of our society came to the market with hogs, and I made a certain bid on them, and Mr. Schoonmaker as representative for Mr. Reeves also bid on them. Q. How much was Schoonmaker compelled to bid for hogs that belonged to members of the society more than the society would bid before he could get them? A. No limit to it whatever. Q. Do you know of him paying 10 cents a hundred more for hogs than you had offered to members of your own society? A. Yes, sir. Q. What do those members do with a part of that money, the excess paid; do they refund to your company? A. Since the 14th day of December, 1909, they have paid me five cents a hundred for

the company. Q. Whenever they sold hogs to a competitor in the market, then they paid to you as treasurer of the company five cents a hundred? A. Yes, sir. I am buying from outsiders as well as from members of the company. A double-deck car of hogs would weigh from 22,000 to 32,000 pounds; the minimum weight is 22,000 pounds. Where members of our society sold hogs to Mr. Reeves during the last year some sold for ten cents and some sold for five cents in excess of my highest bid. Q. In case Mr. Reeves was compelled to pay ten cents per hundred that would be one dollar on a thousand, wouldn't it? A. Yes, in case he was compelled to pay ten cents. In case of a 25,000-pound car it would be $25 on a car. Q. In case Henry Reeves bought a car load of hogs from your association and was compelled to pay ten cents a hundred more than you had bid for a like car load, he would have to pay $25 more for the car than you, would he not? A. Yes, if he was compelled to do that, it would be $25. From the bulk of the members of our association I could buy cheaper than Mr. Reeves could. He has bought them for the same price I was willing to pay and he has bid ten cents more than I bid in order to get them. It depends on the competition in buying whether I can make a profit of ten cents a hundred on hogs. Figuring one year with another I have never made a profit of ten cents a hundred on hogs I have bought. We do make ten cents a hundred lots of times; we don't make that right straight along. Q. Do you remember of any farmers who are members of your association coming to Decorah with hogs for sale where your competitor's representative bid five cents a hundred more than your highest bid and you notified the farmer that he couldn't sell hogs on a five-cent raise because he was a member of the society? A. I didn't notify him that he couldn't sell them on a five-cent raise; I notified him that he is supposed to pay five cents to the company; it would be an even thing if he sold to me or Reeves. Of course he does as he wants to, whether he wants to sell to me or Reeves, he is supposed to pay five cents a hundred to the company; a member of the society is supposed to pay providing he sells to Reeves to pay his share of the running expenses of the company. I have at times gone out and bid more for hogs of a farmer who is not a member of the company than Reeves bid and got the hogs. I bid more than Mr. Reeves bid and in that particular instance bid more than Mr. Reeves was willing to

pay, and I sold such hogs, some in Chicago, some in Minnesota, and some in Wisconsin, on the same markets that I have sold hogs that were bought from farmers who were not members of the society.

Ofttimes in buying hogs from strangers, the society, defendant, paid more for hogs than plaintiff was able to pay, but whether this was due to economies practiced by it, to the fact that it had a surplus, or to the fact that members were compelled to contribute, whether they sold to the society or not, does not appear. But it is shown that in some instances it paid more to strangers than to members, when in competition with plaintiff and his buyer. The net effect of the by-law in question was to compel all members to sell their hogs to the society, at such price as it might offer, or, in the event of sale to another, to forfeit and pay to the society five cents per hundredweight sold to any competitor. In order to be on an equality with defendant, in the purchase of the hogs belonging to members, plaintiff had to offer five cents per hundredweight more than defendant offered, and according to the testimony as to the actual usage in the market, plaintiff was compelled to pay ten cents per hundred more than was offered by the defendant. This society was something more than a mere selling agency. It not only acted as seller, but also purchased, in the open market, from members and nonmembers, alike, save as heretofore stated.

The society was organized as a corporation for pecuniary profit and had $4,000 in its treasury from the sales of stock. True, the testimony shows that it found, from experience, that it cost approximately 5 per cent. per hundredweight to buy and market the hogs, including all the expenses of the society, adding salaries, etc.; but the fact that it made no profits is not in itself controlling.

Chapter 225 of the Acts of the Thirty-Third General Assembly provides:

Section 1. That it shall be unlawful for any person, company, partnership, association or corporation owning or operating any business of buying, selling, handling, consigning or transporting any commodity, or any article of commerce, to enter into any agreement, contract or combination with any other dealer, or dealers, partnership, company, corporation or association of dealers, whether within or without the state, engaged in like business, for the fixing of the price or prices at which any commodity or any article of commerce should be sold by different dealers or sellers; or to divide between said dealers the aggregate or net proceeds of the earnings of such dealers and sellers, or any portion thereof; or to form, enter into, maintain, or contribute money or anything of value to any trust, pool, combination or association of persons of whatsoever character or name, which has for any of its objects the prevention of full and free competition among buyers, sellers, or dealers in any commodity or any article of commerce; or to do or permit to be done by his or their authority any act or thing whereby the free action of competition in the buying or selling of any commodity or any article of commerce is restrained or prevented.

Sec. 2. That in case any person, company, partnership, corporation or association, trust, pool or combination of whatsoever name shall do, cause to be done, or permit to be done, any act, matter or thing in this act prohibited or declared to be unlawful, such person, partnership, company, association, corporation, trust, pool or combination shall be liable to the person, partnership, company, association or corporation injured thereby for the full amount of damages sustained in consequence of any such violation of the provisions of this act.

Sec. 3. That any person, partnership, company, association or corporation subject to the provisions of this act, or any person, trust, combination, pool or association, or any director, officer, lessee, receiver, trustee, employee, clerk, agent or any person acting for or employed by them, who shall violate any of the provisions of section 1 of this act, or who shall aid and abet in such violation, shall be deemed guilty of a misdemeanor, and shall upon conviction thereof be fined any sum not less than five hundred dollars ($500) and not exceeding two thousand dollars ($2,000) or imprisoned in the county jail for a period not exceeding six months, or both, at the discretion of the court. It shall be the duty of the grand jury to inquire

into and ascertain if there exists any pool, trust, combination or violation of any provisions in this act, in their respective counties.

Without reference to this chapter, monopolies have always been odious at common law, and all

**1. MONOPOLIES: contracts in restraint of trade.** contracts, arrangements, or agreements in restraint of trade or of free competition are void.

It was not necessary, under the common law, that the monopoly be perfect, as it was its tendency, rather than its ultimate effect, which the law reproved. *Montague v. Lowry*, 193 U. S. 38 (24 Sup. Ct. 307, 48 L. Ed. 608) ; *More v. Bennett*, 140 Ill. 69 (29 N. E. 888, 15 L. R. A. 361, 33 Am. St. Rep. 216).

As a rule, a contract which creates such a monopoly as to put it in the power of such combination to raise or lower prices is invalid. *State v. Gas Co.*, 153 Ind. 483 (53 N. E. 1089, 53 L. R. A. 413, 74 Am. St. Rep. 314) ; *Addyston v. United States*, 175 U. S. 211 (20 Sup. Ct. 96, 44 L. Ed. 136) ; *Richardson v. Buhl*, 77 Mich. 632 (43 N. W. 1102, 6 L. R. A. 457) ; *State v. Oil Co.*, 49 Ohio St. 137 (30 N. E. 279, 15 L. R. A. 146, 34 Am. St. Rep. 541).

A contract or arrangement, between persons in a given business, whereby they seek to control the price of an article, is invalid, especially where the article in question is one of necessity or in general use. *Beechley v. Mulville*, 102 Iowa, 602; *Cohen v. Envelope Co.*, 166 N. Y. 292 (59 N. E. 906) ; *Ford v. Association*, 155 Ill. 166 (39 N. E. 651, 27 L. R. A. 298) ; *Vulcan Co. v. Powder*, 96 Cal. 510 (31 Pac. 581, 31 Am. St. Rep. 242).

Of course, a mere selling agency is not a monopoly, and neither the common law nor the anti-trust statutes apply to

**2. SAME: selling agencies.** a genuine selling agency. *Cummings v. Blue Stone Co.*, 164 N. Y. 401 (58 N. E. 525, 52 L. R. A. 262, 79 Am. St. Rep. 655) ; *Welch v. Phelps Co.*, 89

Tex. 653 (36 S. W. 71). Yet, if the plan be that of an agency, but the purpose is to create a monopoly, it is invalid. *Pacific Co. v. Adler,* 90 Cal. 110 (27 Pac. 36, 25 Am. St. Rep. 102); *Cummings v. Blue Stone Co., supra.*

Whilst originally all contracts in restraint of trade were illegal, some exceptions were introduced into the common law,

3. SAME: contracts in restraint of trade: validity.

and the rule now seems to be that such contracts are not illegal, save when unreasonable in character, and that where incident or ancillary to some lawful contract, as between vendor and purchaser, partnership, employer and employee, and are not unreasonable in their scope or operation, they are not illegal. *Hoover v. Graves,* 7 Bing. 735; (s. c., 20 E. Com. Law, 310;) *Jayne Co. v. Turner,* 132 Iowa, 7.

Again, the doctrine of restraint as applied to the early cases has been broadened, and all contracts in unreasonable

4. SAME.

restraint of competition are now understood to be in restraint of trade. Eddy on Combinations, section 720; *Arnold Co. v. Jones Co.,* 152 Ala. 501, (44 South, 662, 12 L. R. A. [N. S.] 150). In the latter case, the Supreme Court of Alabama said:

Nearly all of the decisions on the subject of preventing and 'stifling' competition involved combination among those having commodities for sale to hold up the prices; but the principle is the same, whether the combination be upon the part of the sellers or of the purchasers. He who has commodities to sell in the market has the same right to competition among buyers as the purchaser has to competition among sellers. *Nester v. Continental Brewing Co.,* 161 Pa. 473, (29 Atl. 102, 24 L. R. A. 247, 41 Am. St. Rep. 894); *Bailey v. Master Plumbers' Ass'n,* 103 Tenn. 99, (52 S. W. 853, 46 L. R. A. 561); *Harding v. American Glucose Co.,* 74 Am. St. Rep. 255, note; *Central Ohio Salt Co. v. Guthrie,* 35 Ohio St. 666; *Texas Standard Oil Co. v. Adoue,* 83 Tex. 650, (19 S. W. 274, 15 L. R. A. 593, 29 Am. St. Rep. 690); *State v. Smiley,* 65 Kan. 240, (69 Pac. 199, 67 L R. A. 903, 913). It is true, also, that in the greater number of cases the combinations were among a considerable number of persons, with

the evident purpose of creating a monopoly: but, as stated in the case of *Salt Co. v. Guthrie, supra:* 'Courts will not stop to inquire as to the degree of injury inflicted upon the public. It is enough to know that the inevitable tendency of such contracts is injurious to the public.' 35' Ohio St. 672; Pingree's Extraordinary, etc., Contracts, section 321.  In the *Stenographers'* case it is said: 'True, the restraint is not so far reaching as it would have been if all the stenographers in the city had joined the association; but, so far as it goes it is of precisely the same character, produced the same results, and is subject to the same legal objection.' *More v. Bennett,* 140 Ill. 69, (29 N. E. 888, 15 L. R. A. 361, 33 Am. St. Rep. 216). A secret combination among grain dealers, in the nature of a partnership, was held void, as tending to 'stifle all competition.' *Craft et al. v. McConoughy,* 79 Ill. 346, 350, (22 Am. Rep. 171).  'If its object is to prevent or impede free and fair competition in trade, and may in fact have that tendency, it is void as being against public policy.' *Anderson v. Jett,* 89 Ky. 375, 380, (12 S. W. 670, 6 L. R. A. 390); *Judd v. Harrington Com. Pl.,* 19 N. Y. Supp. 406, 412.

In *Brown v. Jacobs Co.,* 115 Ga. 429 (41 S. E. 553, 57 L. R. A. 547, 90 Am. St. Rep. 126), the Supreme Court of Georgia held that a combination of mercantile dealers to compel another, dealing in similar goods, to sell at prices fixed by it, or, upon refusal so to do, to prevent those of its members, who were purchasing customers, from selling goods to him, was, upon general legal principles, contrary to public policy and void.  See, also, *Hawarden v. Coal Co.,* 111 Wis. 545 (87 N. W. 472, 55 L. R. A. 828); *Ertz v. Produce Exc.,* 82 Minn. 173 (84 N. W. 743, 51 L. R. A. 825, 83 Am. St. Rep. 419); *Straus v. Am. Pub. Ass'n,* 177 N. Y. 473 (69 N. E. 1107, 64 L. R. A. 701, 101 Am. St. Rep. 819); *Martell v. White,* 185 Mass. 255 (69 N. E. 1085, 64 L. R. A. 260, 102 Am. St. Rep. 341).

In *Anderson v. Jett,* 89 Ky. 375 (12 S. W. 670, 6 L. R. A. 390), the Supreme Court of Kentucky said: "Rivalry is the life of trade.  The thrift and welfare of the people depend upon it.  Monopoly is opposed to it all along the line.  The

accumulation of wealth out of the brow of sweat of honest toilers, by means of combinations, is opposed to competing trade and enterprise. That public policy that encourages fair dealing, honest thrift, and enterprise among all the citizens of the commonwealth, and is opposed to monopolies and combinations because unfriendly to such fair dealing, thrift, and enterprise, declares all combinations whose object is to destroy or impede free competition between the several lines of business engaged in, utterly void. The combination or agreement, whether or not in the particular instance it has the desired effect, is void. The vice is in the combination or agreement. The practical evil effect of the combination only demonstrates its character; but if its object is to prevent or impede free and fair competiton in trade, and may, in fact, have that tendency, it is void as being against public policy.'' See, also, as supporting the same view, our own case of *Chapin v. Brown,* 83 Iowa, 156; and *Boutwell v. Marr,* 71 Vt. 1 (42 Atl. 607, 43 L. R. A. 803, 76 Am. St. Rep. 746).

*Martell v. White,* 185 Mass. 255 (69 N. E. 1085, 64 L. R. A. 260, 102 Am. St. Rep. 341), is a very instructive case from the Supreme Court of Massachusetts, and the opinion is too long to be quoted at length. The syllabus, however, correctly states the holding, and we here set it forth *in extenso*: ''Defendants, granite manufactures of a city, formed an association, a by-law of which provided that any member having business transactions with any other such manufacturer of the city in relation to granite should, for each such transaction, contribute to the association's expenses from $1 to $500; the amount to be determined by the association. By means of fines from $10 to $100 on members for dealings with plaintiff, his business was ruined. Held, that though the association's object was competition, which is not illegal, the means—coercion by fines—were illegal, so that defendants were liable for the injury.'' *Ellis v. Inman,* 131 Fed. 182 (65 C. C. A. 488),

is also closely in point; as is *Jackson v. Stanfield,* 137 Ind. 592 (36 N. E. 345, 37 N. E. 14, 23 L. R. A. 588).

We need not refer to many other authorities announcing the same rules. So long as competition is regarded as the life of trade, all combinations, contracts, arrangements, or agreements made to stifle it, or which may have that effect, are regarded as unlawful, save as heretofore stated, where connected incidentally with some other contract as of purchase or sale or with contracts of employment, etc., so long as such restraints are reasonable and just. But, where disconnected with some other contract and made enforceable by fine or penalty, we think they come within the ban of the law.

True it is that each of the members of this association might have concluded not to sell any of his hogs to the plaintiff, and, perhaps, all might have agreed in advance not to do so. This would have been freedom of trade. But here there is freedom of trade in form, but annexed thereto is a fine or penalty for exercising such freedom. This is restraint of trade, or rather restraint of competition. That such fine or penalty made the society an illegal one is to our minds too clear for argument. Plaintiff was placed at a disadvantage and could not compete with the society in purchasing hogs from its members, and the members were not free to deal with plaintiff. If they dealt with him, he either forfeited his profits, by reason of having to pay too much for his hogs, or they forfeited a part of the purchase price as a penalty for selling to another. To our minds, this was undue restraint of competition, or, as the term is now understood, "restraint of trade."

II. Next, it is contended that, conceding the arrangement and agreement is illegal, plaintiff is not entitled to an injunction to restrain the defendants from carrying it out. It seems to us that plaintiff has suffered a wrong and that he is threatened with further injury to his business, growing out of defendant's illegal acts. In virtue of his being a competitor with the defendant asso-

5. SAME: injunction.

ciation, he has the right to free and untrammeled competition with it, and if through illegal means he has been made to suffer in the past, and will do so in the future, he is entitled to the protective arm of the court. See *Bear v. City*, 147 Iowa, 341. If, for no other reason, he is entitled to an injunction to avoid a multiplicity of suits. In at least two cases it has been held that one circumstanced as plaintiff may maintain an action to enjoin the illegal acts. See *Jackson v. Stanfield*, 137 Ind. 592 (36 N. E. 345, 37 N. E. 14, 23 L. R. A. 588) ; *Employing Club v. Blosser Co.*, 122 Ga. 509 (50 S. E. 353, 69 L. R. A. 90, 106 Am. St. Rep. 137, 2 Ann. Cas. 694).

The decree of the trial court was as follows:

. . . That the defendant corporation, Ole Ellingson, manager and treasurer, A. T. Holton, president, and Ed. Sellman, secretary, of said corporation, and each of them, their servants, agents, officers, directors, and employees, be and the same are hereby perpetually restrained and enjoined from exacting, collecting, receiving, or in any manner accepting any sum or amount whatever from any bid made by any competitor upon the general market at Decorah, Iowa, and vicinity, as an inducement or condition upon which said sellers shall or may sell or dispose of live stock to plaintiff, his servants, agents, or employees, and that plaintiff have judgment against defendants for costs.

This sufficiently guarded the rights of the defendants. It seems to be correct, and it is *Affirmed.*