CHARLES J. COHEN, Respondent, v. THE BERLIN & JONES ENVELOPE COMPANY, Appellant, Impleaded with Others.

1. CONTRACT — CONSTRUCTION A QUESTION OF LAW. The question whether a contract is non-enforcible because in restraint of trade is one of law and does not become a question of fact because it is necessary to prove the situation at the time of its execution and the facts and circumstances surrounding it in order that the real intent of the parties may be ascertained.

2. WHEN VOID AS TENDING TO CREATE A MONOPOLY. An agreement, between manufacturers of eighty-five per cent of the envelopes of the country and an outside manufacturer, providing that the selling price of all envelopes manufactured by them during a term of years should be

fixed by a corporate agent and instrument of the combination, threatens a monopoly whereby trade in a useful article may be restrained and its price unreasonably enhanced, and is, therefore, invalid.

*Cohen* v. *Berlin & Jones Env lope Co.*, 38 App. Div. 499, reversed.

(Argued December 19, 1900; decided March 26, 1901.)

APPEAL from a judgment of the Appellate Division of the Supreme Court in the second judicial department, entered March 15, 1899, affirming a judgment in favor of plaintiff entered upon a verdict, and an order denying a motion for a new trial.

The contract under which plaintiff recovered his judgment the defendants claim to be null and void because in restraint of trade, and it reads as follows :

"This agreement made this eighth day of August, by and between Charles J. Cohen, manufacturers of the City of Philadelphia, of the first part, and The Morgan Env. Co. of Springfield, Mass.; The White Corbin & Company of Rockville, Conn. ; The Holyoke Env. Co. of Holyoke, Mass. ; The Whitcomb Env. Co. of Worcester, Mass. ; The Plimpton Manufacturing Company of Hartford, Conn. ; Powers Paper Company of Springfield, Mass. ; Samuel Raynor & Co. of New York City ; J. Q. Preble & Co. of New York City ; The Berlin and Jones Env. Co., of New York City, parties of the second part, Witnesseth :

." Whereas, the Standard Envelope Company which is under the control of the parties of the second part will issue from time to time a schedule or schedules containing a list of prices of envelopes sold in the market as staple goods, for printing and tinting the same, etcetra, as hereinafter more particularly set forth ; now, therefore, the parties hereto mutually covenant and agree with each other, their and each of their executors, administrators, successors and assigns, as follows, to wit :

"1st. The said party of the first part agrees to sell to the said parties of the second part and the said parties of the second part agree to buy and pay for so much of the production of envelopes of the said party of the first part as shall

not exceed in the whole two hundred and fifty thousand envelopes daily for the period of five years from the date hereof, counting three hundred days to the year. The prices and terms for such envelopes to be in conformity to the schedules from time to time in force, issued by the Standard Envelope Company. Should the parties of the second part fail to take the said envelopes, or any part thereof, then they shall pay to the said party of the first part damages for such non-taking, which damages are hereby mutually liquidated and agreed upon to be (10) ten cents per thousand. The party of the first part, however, agrees that he will use his best endeavors to sell to the trade in the usual course of business any of the said envelopes not taken by the said parties of the second part at the prices hereinbefore provided and as to such goods so sold, the liquidated damages of (10) ten cents shall not be paid, the intent of this contract being that if the party of the first part shall sell to the trade two hundred and fifty thousand envelopes daily, then he shall not be entitled to any damages in respect of such day's production.

" 2d. The said party of the first part agrees to pay to the said parties of the second part the sum of (10) ten cents per thousand for each thousand of envelopes sold per day to the trade beyond the two hundred and fifty thousand above provided for.

" 3d. The intent of the contract is to cover total annual sales of seventy-five millions of envelopes, and the word 'daily' is not intended to refer to the production of any particular day, but to the average production. Settlements between the parties are to be made on the first of each month, or twenty days thereafter.

" 4th. The parties of the second part hereby constitute and appoint the Standard Envelope Company of Springfield, Mass., as their attorney and agent, for notices, settlements, and dealings provided for in this contract, with the party of the first part.

" 5th. Tender of the goods by the party of the first part is hereby waived by the parties of the second part, unless an.

express demand for the delivery of the same be made by the parties of the second part in writing. Deliveries of goods by the party of the first part shall be f. o. b. in Philadelphia.

" 7th. The party of the first part shall not be required to furnish goods in any event for less than their cost of manufacturing.

" 8th. The parties of the second part agree to sell to the party of the first part all envelopes they may order at schedule prices, on the same terms as other buyers not parties hereto. Envelopes bought by the said party of the first part from any person whomsoever and by them sold, not to be computed in the two hundred and fifty thousand above mentioned.

" 9th. The said party of the first part agrees that he will not, during the term of this contract, directly or indirectly, sell to any one, or manufacture for any one furnishing his own paper therefor, envelopes below the schedule prices which may be issued from time to time by the Standard Envelope Company as hereinbefore provided for regular goods; that he will not vary in any way from the provisions of such schedule; that he will not make any rebate or gift to any purchaser or any party furnishing his own paper to be manufactured; and that he will not do or omit anything the doing or omission of which will in any manner enable anyone to buy envelopes or get envelopes manufactured below said schedule prices; that he will employ salesmen on salary only and bill all envelopes direct to the purchaser; that he will not allow his salesmen to offer any pecuniary inducement to any purchaser of envelopes, nor place any envelopes on sale on consignment; nor employ as salesman any person having a store for the sale of paper and envelopes or stationery goods or notions, or be carrying any line of envelopes in stock, or any person connected with such store or employed therein or thereby. In case of any intentional violation of this ninth clause by the party of the first part or his salesmen, the party of the first part will pay to the parties of the second part as agreed and liquidated damages twenty-five cents per thousand for each thousand

sold in such violation, and also a sum equal to the value of the goods sold in such violation.

"10th. The party of the first part agrees that, during the term hereof, he will not sell, pledge, transfer, lease or give possession of his manufacturing plant or envelope machinery, or any part thereof, to any other party than a party to this agreement, except upon condition that such party shall thereupon immediately become substituted for the party of the first part in this agreement; and should any such sale, pledge, transfer, lease or possession be made or given, the party of the first part agrees that he will not thereafter, during the period of this contract, engage in the manufacture or sale of envelopes, except west of the one hundredth degree of longitude and south of the thirtieth parallel of latitude. The penalty for any violation of this tenth clause shall be fifty thousand dollars agreed and liquidated damages.

"11th. The party of the first part agrees that he will not in any way, directly or indirectly, interest himself by the advancement of capital or otherwise with any person, firm or corporation engaged or intending to engage in the manufacture or sale of envelopes or envelope machinery, other than with the parties hereto; but nothing herein shall be construed as restricting the rights of the party of the first part to deal in envelopes or envelope machinery in any foreign country. The penalty for violation of this eleventh clause shall be fifty thousand dollars agreed and liquidated damages.

"12th. All orders for envelopes on the books of the party of the first part, and all contracts made by him for the sale or manufacture of envelopes or for which he may be held previous to the signing of this document, shall be exempt from the provisions of this contract. Such orders and contract on regular goods are not to exceed one million envelopes, and a list of the same to be sent to the parties of the second part.

"13th. None of the provisions hereof shall apply to contracts with the government of the United States or any department thereof or any telegraph company, or to the street car change envelopes, manilla, printed or plain (No. 1

drug size), or to papeteries, nor for sales for exportation, where the goods sold are actually exported.

"14th. In case of any alleged violation of this contract by any of the parties hereto or of any disagreement herein, the same shall be referred for settlement to three disinterested referees, one to be chosen by the party of the first part, another by the parties of the second part, and the third by these two, the decision of whom or a majority of whom, made in writing, shall be final and binding on both parties. In any such controversy any party hereto may be required to produce all his books and papers. All rights of any party hereto, both in law and equity, are hereby reserved.

"15th. If any of the parties of the second part commit any of the acts forbidden to the party of the first part by this contract, then the party of the first part shall be entitled as against the party so violating to the same rights and remedies as are herein secured to the parties of the second part.

"16th. In the event of the destruction by casualty of the plant of the party of the first part, in whole or in part, so that he would be prevented from manufacturing, the rights and duties of both parties shall be suspended so far as deliveries and payments are concerned until the plant shall be restored, and the time occupied in such restoration shall be considered as if the party of the first part had daily produced and been paid for two hundred and fifty thousand envelopes.

*Austen G. Fox*, *Robert Thorne* and *Robert W. De Forest* for appellant. The complaint should have been dismissed, as the contract was, upon its face, illegal. (*People* v. *Milk Exchange*, 145 N. Y. 267; *Judd* v. *Harrington*, 139 N. Y. 105; *People* v. *Sheldon*, 139 N. Y. 251; *Arnot* v. *P. & E. C. Co.*, 68 N. Y. 558; *Leonard* v. *Poole*, 114 N. Y. 371; *People* v. *N. R. S. R. Co.*, 54 Hun, 354; 121 N. Y. 582; *Clancey* v. *O. F. Salt Mfg. Co.*, 62 Barb. 406; *S. C. Bank* v. *King*, 44 N. Y. 87; *Strait* v. *Nat. H. Co.*, 18 N. Y. Supp. 224.) No action can be maintained in the courts of this state

when the recovery necessarily depends upon the provisions of an illegal agreement. (*Judd* v. *Harrington*, 139 N. Y. 105.)

*Louis Marshall* and *Samuel Untermyer* for respondent. Not only was the contract valid on its face, but the facts and circumstances appearing in the record amply sustain the finding of the jury that the plaintiff did not enter into the contract with any unlawful intent. (*Holtz* v. *Schmidt*, 59 N. Y. 253 ; *Marsh* v. *Russell*, 66 N. Y. 288 ; *Meyers* v. *Estes*, 164 Mass. 457 ; *Clark* v. *Frank*, 17 Mo. App. 602 ; *Olmstead* v. *D. & C. F. Co.*; 77 Fed. Rep. 265 ; *Brown* v. *Rounsavell*, 78 Ill. 589 ; *Long* v. *Towl*, 42 Mo. 547 ; *Newell* v. *Myendorff*, 9 Mon. 254 ; *Hadden* v. *Dimick*, 31 How. Pr. 196 ; *Matthews* v. *Associated Press*, 136 N. Y. 333.) The plaintiff was not a party to the formation of the Standard Envelope Company, did not participate in its management, had no knowledge of any unlawful purpose that may have been entertained by the defendants, and cannot, therefore, be made to suffer for any vice which they now attribute to themselves. (*Carter-Crume Co.* v. *Peurrung*, 86 Fed. Rep. 439 ; *U. S. C. Co.* v. *P. C. Co.*, 64 Fed. Rep. 946 ; *Arnot* v. *P. & E. C. Co.*, 68 N. Y. 558 ; *Tracy* v. *Talmage*, 14 N. Y. 162.)

PARKER, Ch. J. The learned trial judge quite naturally fell into the error that it was for the jury to say whether the contract which lies at the foundation of this controversy was entered into by the parties to it in good faith and without any intention to prevent competition or unduly enhance or maintain the price of envelopes, inasmuch as the Appellate Division held on a review of the order overruling a demurrer to the complaint that it did not appear upon the face of the agreement that it was null and void because in restraint of trade. It may well be doubted whether a more thorough examination of the contract would not have made it apparent to the Appellate Division that upon its face it was in contravention of public policy long established ; but, be that as it may, the question did not thereupon become, upon all the evidence,

one for the jury, who, by their verdict, might in one county declare such a contract void, and in another uphold the same contract. It sometimes happens that in the construction of contracts it is necessary to have as aids to the court the situation of the parties at the time of the execution of the contract, and all of the facts and circumstances surrounding it, in order to enable the court to determine just what the parties intended by it; because, however, the situation is such that it becomes necessary to prove those facts and circumstances, the question of construction is not transferred from the court to the jury, but instead the question of the construction of the contract continues to be one of law for the court, the facts and circumstances proved being availed of for the purpose of ascertaining the real intent of the parties where otherwise it might be more difficult of ascertainment.

The facts and circumstances surrounding the execution of this contract were proved upon this trial — indeed more proof was offered than was needful — but when the testimony was all in a question was presented which the court alone could pass upon, namely, whether the contract was non-enforcible because in restraint of trade, and in the determination of that question it was the duty of the court to examine the provisions of the contract in the light of the facts and circumstances immediately preceding and attending its execution. That was the course adopted by the trial court in *Cummings* v. *Union Blue Stone Co.* (164 N. Y. 401), and it accords, not only with reason, but with time-honored practice. The law laid down by the court in the *Union Blue Stone Company* case is applicable to this case and is that contracts by which the parties to them combine for the purpose of creating a monopoly in restraint of trade to prevent competition, to control and thus to limit production, to increase prices and maintain them, are contrary to sound public policy and are void. We shall not, therefore, enter upon any discussion of the authorities, but instead will show that within the rule as laid down by us in the *Union Blue Stone Company* case in November last this contract is void.

Before entering upon an examination of the provisions of
the contract it will be serviceable to get in mind the situation
of the parties to the contract, ten in all, just prior to its execu-
tion.   They were all engaged in the manufacture of envelopes,
and the parties of the second part, consisting of nine different
firms and corporations, manufactured about eighty-five per
cent of all the envelopes made in this country, excluding
governmental stamped envelopes.   For some time prior to
August, 1887, the envelope business had been most unsatis-
factory in its results to them as manufacturers, so some of
them undertook to devise a scheme which would put the busi-
ness on a more agreeable basis for the producers of envelopes,
and partly to that end the parties of the second part formed
a corporation known as the Standard Envelope Company, the
stock being mainly issued to the corporations and firms com-
prising the parties of the second part to the contract.   We
shall soon see the part which the Standard Envelope Com-
pany was to play in the scheme undertaken for the improve-
ment of the business of manufacturing envelopes.

The combined production of the parties of the second part
was two billion four hundred million envelopes a year.   Among
the manufacturers of the other fifteen per cent of the envel-
opes was this plaintiff, and it was a part of the scheme of the
corporations and partnerships forming the Standard Envelope
Company to make separate contracts with the other manufac-
turers, including this plaintiff, and contracts similar to the one
entered into with the plaintiff Cohen were entered into with
all the other considerable producers between New England
and Philadelphia.   The parties of the second part also secured
the control of the later patents, as well as the makers of
patented machinery for manufacturing envelopes.

Having then in mind the fact that the situation of the busi-
ness of manufacturing envelopes was most unsatisfactory, and
that the aim of the leading firms and corporations engaged in
the business and who manufactured eighty-five per cent of
the output was to improve that condition, and that as one of
the steps toward it they had formed a corporation which they

could control, which should fix the schedule of prices, and had already made contracts similar in nature to this one with some of the manufacturers outside of those controlling the Standard Envelope Company, we take up this contract for analysis.

In the preamble we observe a recital that "The Standard Envelope Company, which is under the control of the parties of the second part, will issue, from time to time, a schedule or schedules containing a list of prices of envelopes sold in the market as staple goods, for printing and tinting the same, et cetra, as hereinafter more particularly set forth." The first clause of the contract to a casual reader might seem to provide for the sale by Cohen to the parties of the second part at schedule prices of two hundred and fifty thousand envelopes a day, counting three hundred days to the year. But a more careful examination of that clause, together with others, discloses that there was neither promise nor intention on the part of the parties of the second part to take any portion of Cohen's output, but they did agree to pay him ten cents per thousand envelopes for so many of the stipulated number as he should fail to dispose of, and on the other hand Cohen agreed to pay to the parties of the second part ten cents a thousand for each thousand envelopes sold to the trade over and above the two hundred and fifty thousand a day covered by the contract. In this connection it should be noted that prior to the execution of this contract Cohen never made as many as two hundred and fifty thousand envelopes in a day, while his average production was only about one-third of the amount called for by the contract. The limits of Cohen's business, under the contract were, therefore, pretty thoroughly established by the first two clauses. He was to be compensated on the basis of a quarter of a million envelopes a day, although he was not called upon to make any more envelopes than he could sell to the trade or to the parties of the second part at schedule prices, which enabled him to draw upon the parties of the second part monthly for ten cents a thousand on the difference between the output and the two hundred and

fifty thousand envelopes a day, while if his sales should exceed that amount, he should pay to the parties of the second part ten cents a thousand for the excess over the two hundred and fifty thousand a day. The third clause discloses the basis upon which the calculation for the output of each party was founded and it declares that the contract is to cover annual sales of seventy-five millions of envelopes, without regard to the daily production. The fifth and sixth clauses waive a tender of the goods by Cohen in the absence of a written demand for their delivery by the parties of the second part, and relieves the former from furnishing goods for less than the cost of manufacture, while the eighth clause contains a covenant on the part of the parties of the second part to furnish Cohen all envelopes he may order at schedule prices. The purpose of the ninth clause was to prevent Cohen from making sales of envelopes at less than schedule prices, which were to be fixed by the Standard Envelope Company, and it would seem as if no further additions were needed to accomplish that result. It reads : " The said party of the first part agrees that he will not, during the term of this contract directly or indirectly sell to anyone or manufacture for anyone, furnishing his own paper therefor, envelopes below the schedule prices, which may be issued from time to time by The Standard Envelope Company as hereinbefore provided for regular goods ; that he will not vary in any way from the provisions of such schedule ; that he will not make any rebate or any gift to any purchaser or any party furnishing his own paper to be manufactured ; and that he will not do or omit anything, the doing or omission of which will in any manner enable anyone to buy envelopes or get envelopes manufactured below said schedule prices ; that he will employ salesmen on salary only and bill all envelopes direct to the purchaser; that he will not allow his salesmen to offer any pecuniary inducement to any purchaser of envelopes, nor place any envelopes for sale on consignment; nor employ as salesman any person having a store for the sale of paper, or envelopes, or stationery goods, or notions, or be carrying any line of envelopes in stock, or any

person connected with such store or employed therein ·or thereby. In case of any intentional violation of this ninth clause by the party of the first part or his salesmen, the party of the first part will pay to the parties of the second part as agreed and liquidated damages twenty-five cents per thousand for each thousand sold in such violation, and also a sum equal to the value of the goods sold in such violation." By the tenth clause Cohen agreed, under a separate penalty in liquidated damages of fifty thousand dollars, not to sell or otherwise transfer the possession or control of his manufacturing plant or the machinery to any other than a party to the contract, except upon the condition that such parties shall thereupon become immediately substituted in his place and bound by all the terms and provisions of the contract, in which event Cohen agrees not to engage in . the manufacture of envelopes during the term of the contract, "except west of the one hundredth degree of longitude and south of the thirtieth parallel of latitude," which is said not to include any part of the United States except a small portion of the state of Texas. By the eleventh clause Cohen agrees, under a like penalty in liquidated damages of fifty thousand dollars, that he will not in any way directly or indirectly interest himself by the advancement of capital or otherwise with any person or firm engaged or intending to engage in the manufacture and sale of envelopes. The fifteenth clause contains the covenant on the part of the parties of the second part to the contract, which subjects them to the same prohibitions and restrictions as the contract imposes upon Cohen. It reads as follows: "If any of the parties of the second part commit any of the acts forbidden to the party of the first part by this contract, then the party of the first part shall be entitled as against the party so violating, to the same rights and remedies as are herein secured to the parties of the second part." The effect of this provision is to subject all the parties of the second part to the rigorous provisions of the ninth clause against underselling the schedule prices.

The scheme of this agreement may, therefore, be summed

up as follows : The parties of the second part, manufacturing eighty-five per cent of the envelopes of the country, entered into an agreement with the plaintiff, a comparatively small manufacturer of envelopes, by which they and he agreed that envelopes should not be sold by any of the parties to the contract except at the schedule prices fixed by the Standard Envelope Company, the corporate agent and instrument of the parties of the second part. And as an extra inducement to the plaintiff to make such a contract he was awarded ten cents a thousand for thousands of envelopes a day in excess of any sales that he had ever made or was called upon to make, whereby he not only received a large sum of money from the parties of the second part during the time that they recognized the validity of the contract, but has been awarded $15,751.48 for the contested period. The contract gave and was intended to give the parties of the second part, through the Standard Envelope Company the exclusive right to fix prices at which manufacturers of envelopes should sell their output during the term fixed by the contract, the object being to secure a better price for the goods manufactured. Such a contract threatens a monopoly whereby trade in a useful article may be restrained and its price unreasonably enhanced, and it matters not that the parties to it may have so moderately advanced prices that the sum exacted for the product seems to some persons reasonable, for " the scope of the contract, and not the possibility of self-restraint of the parties to it, is the test of its validity." (*Cummings* v. *Union Blue Stone Co., supra.*)

The judgment should be reversed and a new trial ordered, with costs to abide the event.

O'BRIEN, HAIGHT, LANDON and WERNER, JJ., concur; GRAY, J., dissenting ; CULLEN, J., not sitting.

Judgment reversed, etc.