Hillsborough, }
Dec. 31, 1903. }

BANCROFT *&* a.   *v.*   UNION EMBOSSING CO.

Where the owner of a machine sells the exclusive right to make and vend the same, with full license under any letters patent which may be granted, agreeing to furnish all patterns necessary for the manufacture, to transmit to the vendee present and prospective orders, and not to engage in any competing business during the existence of the contract, which is expressed to be the full term of any patent, or twenty years if none be granted, the non-issuance of a fundamental patent does not constitute such a failure of consideration as entitles the purchaser to rescind..

A contract granting an exclusive right to make and vend a machine is not void at common law as being in restraint of trade merely because it is unlimited as to locality, if it affords nothing more than fair and reasonable protection to the party in whose favor it is imposed; nor is it in contravention of the federal statute designed to protect trade and commerce against unlawful restraints and monopolies.

ASSUMPSIT, to recover $200 and interest thereon for each of nine " automatic lateral carving machines," manufactured and sold

by the defendants in accordance with a written contract executed
May 6, 1899, the material provisions of which are set forth in the
opinion.    May 27, 1901, the plaintiffs were notified that the
defendants would not be further bound by the contract; and
about the middle of the following July the patterns mentioned in
the contract were returned to the plaintiffs, who did not assent to
the rescission of the agreement.    Subsequent to the notification,
the defendants manufactured nine machines, four of which were
sold before the patterns were returned, and five of which were
disposed of after that date.

The case was tried at the May term, 1903, of the superior court,
before *Pike*, J.    The plaintiffs contended that the defendants were
liable under the contract for all machines manufactured and sold
by them.    The defendants contended that the right of rescission
was properly exercised by them on May 27, 1901, and that they
were not liable for any machines manufactured after that date.
It was ruled that there was such a failure of consideration as enti-
tled the defendants to rescind by putting the plaintiffs in the situa-
tion they occupied before the execution of the contract; that the
right was exercised within a reasonable time, but that the rescis-
sion was not complete until the patterns were returned; and that
the plaintiffs were entitled to recover the stipulated price for the
four machines sold by the defendants prior to the completion of
the rescission.    The court found a verdict for the plaintiffs in the
sum of $892.33, being the price for four machines and interest
thereon, and to this finding both parties excepted.

*Eastman & Hollis*, for the plaintiffs.

*Arthur W. Morgan* and *Bradford & Hood* (of Indiana), for the
defendants.

BINGHAM, J.    The questions in this case arise upon exceptions
taken by the parties to the findings and rulings made in the supe-
rior court.    At the time the contract in question was executed,
the plaintiffs had not procured a patent upon their embossing
machine; but the parties believed that its principal feature was
novel, and that the plaintiffs would obtain a patent which would
control the manufacture and sale of the machine.    The plaintiffs,
however, were not successful in obtaining such a patent, although
patents were granted to them upon some minor parts.    The
defendants operated under the contract for a period of over two
years, and down to May 27, 1901, when they notified the plain-
tiffs that they would not be further bound by it.    After this
notification the defendants manufactured and sold nine of the

machines, four of which were sold before the middle of July, 1901, when the patterns mentioned in the contract were returned to the plaintiffs. This suit is brought upon the contract to recover the sum of $200 for each of the nine machines so manufactured and sold.

The superior court ruled that there was such a failure of consideration as entitled the defendants to rescind the contract; that a rescission was made within a reasonable time, but was not completed until the middle of July, 1901, when the patterns were returned; and that the plaintiffs could recover the price named in the contract for each of the four machines sold prior to the return of the patterns, but not for those sold after that time.

The plaintiffs claim that the fact that the parties believed the principal feature of the machine was patentable, when it was not, did not constitute a failure of consideration entitling the defendants to rescind the contract; that the consideration for the defendants' undertaking is to be found in the contract itself; that the belief of the parties as to the novelty and patentability of the principal feature of the machine is immaterial; and that the material question is what the parties understood, as gathered from the terms of the written contract.

We are inclined to accede to this view of the case. This is not a proceeding to reform the contract, but to enforce its provisions as therein expressed. If the contract as drawn does not express the understanding of the parties at the time it was made, it can be reformed upon proper proceedings instituted for that purpose; but until reformed, their understanding is to be ascertained from the written contract, viewed in the light of the circumstances under which it was executed; and a finding as to the belief of the parties, based upon evidence gathered from extraneous sources, is immaterial. *Horne* v. *Hutchins, ante, p.* 214.

It is apparent from the contract that the plaintiffs did not agree they would be successful in obtaining patents, fundamental or otherwise, upon the machine, or that the defendants should be excused from complying with its terms in case a fundamental patent was not obtained. What the plaintiffs undertook to do is there set forth in plain and unambiguous terms. After stating that they were ready and willing to give the defendants " the exclusive right, so far as it is in their power, to manufacture and sell the said machines," they agree (1) that the defendants shall have " full and exclusive license under any letters patent which may be granted to them . . . for inventions and improvements contained in or relating to said embossing machine, for the full term for which any such letters patent are or may be granted, including any renewal, reissue, or extension thereof," whether obtained

from the government of the United States or any foreign country; (2) "that they will not during the existence of this contract make, vend, or use any embossing machines" of the type named; (3) that they will give to the defendants "all patterns and drawings which they have relating to such machines, and will furnish such drawings as may be necessary for the manufacture of the machines, and will give them the benefit of their advice and coöperation in the manufacture of the said machines so long as this contract shall remain in force"; (4) that they will transfer to the defendants "all orders which they now have or may hereafter have for embossing machines of the type . . . described," except two orders specifically named; (5) "that they will not during the existence of this contract in any way sell or assign any letters patent of the United States or any foreign country relating to said machine or any improvement thereon, or grant any rights thereunder"; and (6) that "this contract shall last for the full term for which any letters patent upon the applications of the [plaintiffs] . . . are or may be granted, including any renewal, reissue, or extension thereof, and if no such patent shall be granted upon said machine, then this contract shall last for the term of twenty years from the date hereof." These undertakings of the plaintiffs constituted the consideration for those of the defendants; and it is found that the plaintiffs "did what they in the agreement covenanted and agreed," and that "in consequence . . . the defendants were relieved from competition with the plaintiffs."

The contract was not a mere license to the defendants to manufacture and sell machines of this type. provided the plaintiffs were successful in obtaining an exclusive right by letters patent upon the principal feature of the machine, and an agreement to waive the enforcement of such right against the defendants; but was a sale of the plaintiffs' good will in the business of manufacturing and selling machines of this type, together with any patent rights which they might procure upon the machine from the government of the United States or any foreign country, and an agreement not to make, vend, or use the machine during the existence of the contract. *Wood* v. *Company*, 165 N. Y. 545; *Brett* v. *Ebel*, 29 N. Y. App. Div. 256.

But the defendants say that, if such was the nature of the contract, it was in general restraint of trade and void, for the reason that it was unlimited as to territory, although limited as to time. An agreement in restraint of a man's right to exercise his trade or calling, according to the early common law of England, was void as against public policy. In those days a man could not lawfully exercise a trade to which he had not been duly apprenticed, and one so admitted was obliged by statute to follow and

exercise his trade under a penalty. Poll. Cont. 313. Hence, to enforce such an agreement was to deny the covenantor the right to earn his living, and to require him to violate an express provision of law. When the courts first began to recognize as valid any restraint upon trade, such restraints were confined within very narrow limits. The limitations which were allowed were such as were clearly necessary to protect the covenantee in the ordinary exercise of his trade or calling, having reference to the state of society and the conditions under which business was then carried on. In the application of this principle of reasonable necessity, a classification of agreements in restraint of trade came to be recognized, to wit: (1) Where the restraint was unlimited both as to time and space; (2) where it was limited as to time, but unlimited as to space; (3) where it was limited as to space, but unlimited as to time; and (4) where it was limited as to both time and space. If the agreement fell within the first or second class, it was held to be void; but if within the third or fourth, it was valid. In this jurisdiction three cases have arisen, two of which came within the second and one within the fourth class, and in all of them the contracts were upheld. *Webster* v. *Buss*, 61 N. H. 40; *Eastern Express Co.* v. *Meserve*, 60 N. H. 198; *Perkins* v. *Clay*, 54 N. H. 518. Whether the contracts were considered reasonable, having reference to the nature of the business and the circumstances of each case, is not stated. No decision has been found in our reports in which the restraint was of the nature now under consideration.

Within the past few years the above classification, as a hard and fast rule of decision, has been questioned; and the house of lords and many of the courts of this country, after an extensive review of the cases, have refused to be bound by it. *Nordenfelt* v. *Company*, [1894] A. C. 535; *Rousillon* v. *Rousillon*, L. R. 14 Ch. Div. 351; *Anchor Electric Co.* v. *Hawkes*, 171 Mass. 101; *Watertown etc. Co.* v. *Pool*, 51 Hun 157, 163; *U. S. Cordage Co.* v. *Company*, 90 Hun 429, 434; *Ru Ton* v. *Everitt*, 35 N. Y. App. Div. 412; *Diamond Match Co.* v. *Roeber*, 106 N. Y. 473; *Wood* v. *Company*, 165 N. Y. 545; *National etc. Co.* v. *Haberman*, 120 Fed. Rep. 415; 24 Am. & Eng. Enc. Law 842–862. The conclusion reached in these decisions is that the validity of the agreement depends upon the reasonableness of the restraint as applied to the particular circumstances of each case, and that the contract is not necessarily unreasonable and void if it is not limited as to space. It has even been denied that the alleged rule as to limits of space ever existed in England, as a positive rule of law, in any class of cases. *Rousillon* v. *Rousillon, supra*, 366.

If, as is quite probable, this classification was the result of the

application of the principle of reasonable necessity in a series of cases, at a time when trade and intercourse were necessarily confined to a given locality or to comparatively narrow limits, and the classification as applied to those conditions met the rule of reasonableness, there would seem to be no reason for its continued recognition and application, as a hard and fast rule, to cases arising under the enlarged and materially changed conditions in which trade and commerce are now carried on, but rather that there should be a recurrence to and application of the principle itself.

In *Wood* v. *Company, supra, Gray,* J., in speaking of the doctrine which avoids a contract for being one in restraint of trade, says: " It had its origin at a time when the field of human enterprise was limited, and when each man's industrial activity was, more or less, necessary to the material well-being and welfare of the community and of the state. . . . The conditions which made so rigid a doctrine reasonable no longer exist. In the present practically unlimited field of human enterprise, there is no good reason for restricting the freedom to contract, or for fearing injury to the public from contracts which prevent a person from carrying on a particular business. Interference would only be justifiable when it was demonstrable that in some way the public interests were endangered. But contracts between parties, which have for their object the removal of a rival and competitor in a business, are not to be regarded as contracts in restraint of trade. They do not close the field of competition except to the particular party to be affected. To say, at the present day, that such a contract as was made in this case was affected by a public interest, and was a matter of public concern, would be, in my opinion, unreasonable."

In *Diamond Match Co.* v. *Roeber, supra, Andrews,* J., says: " When the restraint is general, but at the same time is coextensive only with the interest to be protected and with the benefit meant to be conferred, there seems to be no good reason why, as between the parties, the contract is not as reasonable as when the interest is partial and there is a corresponding partial restraint. And is there any real public interest which necessarily condemns the one and not the other? It is an encouragement to industry and to enterprise in building up a trade, that a man shall be allowed to sell the good will of the business and the fruits of his industry upon the best terms he can obtain. If his business extends over a continent, does public policy forbid his accompanying the sale with a stipulation for restraint coextensive with the business which he sells? If such a contract is permitted, is the seller any more likely to become a burden on the public than a man who, having built up a local trade only, sells it, binding himself not to

carry it on· in the locality ?   Are the opportunities for employment and for the exercise of useful talents so shut up and hemmed in that the public is likely to lose a useful member of society in the one case and not in the other ?   Indeed, what public policy requires is often a vague and difficult inquiry.   It is clear that public policy and the interests of society favor the utmost freedom of contract, within the law, and require that business transactions should not be trammelled by unnecessary restrictions.   ' If   .   .   .   .   there is one thing more than any other which public policy requires, it is that men of full age and competent understanding shall have the utmost liberty of contracting, and that contracts, when entered into freely and voluntarily, shall be held good and shall be enforced by courts of justice.'   It has sometimes been suggested that the doctrine that contracts in general restraint of trade are void is founded in part upon the policy of preventing monopolies, which are opposed to the liberty of the subject, and the granting of which by the king under claim of royal prerogative led to conflicts memorable in English history.   But covenants of the character of the one now in question operate simply to prevent the covenantor from engaging in the business which he sells, so as to protect the purchaser in the enjoyment of what he has purchased.   To the extent that the contract prevents the vendor from carrying on the particular trade, it deprives the community of any benefit it might derive from his entering into competition. But the business is open to all others, and there is little danger that· the public will suffer harm from lack of persons to engage in a profitable industry.   Such contracts do not create monopolies. They confer no special or exclusive privilege.   If contracts in general restraint of trade, where the trade is general, are void as tending to monopolies, contracts in partial restraint, where the trade is local, are subject to the same objection, because they deprive the local community of the services of the covenantor in the particular trade or calling, and prevent his becoming a competitor with the covenantee.   We are not aware of any rule of law which makes the motive of the covenantee the test of the validity of such a contract.   On the contrary, we suppose a party may legally purchase the trade and business of another for the very purpose of preventing competition; and the validity of the contract, if supported by a consideration, will depend upon its reasonableness as between the parties.   Combinations between producers to limit production and to enhance prices are or may be unlawful, but they stand on a different footing."

It seems to us that inasmuch as public policy requires that a man should be free to sell in the most advantageous way what he has obtained ·by his skill or other means, ·the same public policy

should permit him to enter into restrictive covenants in aid of the thing sold, provided the restriction in the judgment of the court is not unreasonable, having regard to the subject-matter of the contract. And it seems to be generally held that the question whether the restriction is reasonable, as applied in this class of cases, is one of law and not of fact. *Anchor Electric Co.* v. *Hawkes, supra; Cohen* v. *Company,* 166 N. Y. 292; *Linn* v. *Sigsbee,* 67 Ill. 75; *Haynes* v. *Doman,* [1899] 2 Ch. Div. 13, 24; Poll. Cont. 316; 24 Am. & Eng. Enc. Law 858.

In the application of this principle, the question is whether the restraint affords more than a fair and reasonable protection to the party in whose favor it is imposed. If it does not, the contract should be upheld. It will be noticed that the contract in this case does not restrain the plaintiffs from manufacturing and selling embossing machines of every description, as was the case in *Berlin Machine Works* v. *Perry,* 71 Wis. 495, cited by the defendants, but simply those involving the specific feature which the defendants were to manufacture and sell under the contract; and considering the nature of the business, the admitted limited number of customers, and their location throughout the various states of this country, we do not think the restriction can be held to exceed what is necessary for the protection of the purchaser, or that it violates any principle of public policy.

The defendants also contend that the contract comes within the provisions of the act of congress of July 2, 1890, preventing restraints upon trade and commerce among the several states and foreign nations, and is therefore void. But we fail to see how the contract comes within this statute. It does not place or contemplate any direct restraint upon the right of the defendants to make sales of the manufactured article in any of the United States or any foreign country. Under it, the defendants were at liberty to carry on their trade in all of the states of the Union or any foreign country. This contention was raised in *Brett* v. *Ebel, supra,* where the restraint was of a similar nature, and it was held that the contract was not in contravention of the act or within its spirit; that if the " act were to be construed literally and technically, so as to embrace such a contract, . . . it would involve consequences most harmful to the commercial community—consequences which . . . were never contemplated by the lawmakers." See, also, *United States* v. *Association,* 166 U. S. 290; *United States* v. *Company,* 85 Fed. Rep. 271.

The supreme court of the United States, in considering this statute, has said: " When it is seen that the agreement entered into does not directly relate to and act upon and embrace interstate commerce, and that it was executed for another and entirely

different purpose, and that it was calculated to attain it, the agreement would be upheld, if its effect upon that commerce were only indirect and incidental." *Addyston etc. Co.* v. *United States,* 175 U. S. 221, 224,—44 Law ed. 136, 148; *Anderson* v. *United States,* 171 U. S. 604,—43 Law ed. 300.

We are therefore of the opinion that this contention of the defendants cannot be maintained, and that the plaintiffs are entitled to recover the contract price and interest on the five machines sold after the middle of July, 1901, in addition to what has already been allowed them.

*Plaintiffs' exception sustained: defendants' exception overruled.*

All concurred.