A corporation will not be dissolved at the instance of the state for misconduct other than a violation of the law of its being, which has produced or tends to produce injury to the public.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 12, Corporations, §§ 2373–2381, 2396, 2397.]

2. SAME—APPLICATION TO SUE—HEARING.

Where, on an application of the Attorney General for leave to sue to dissolve a corporation, there was no issue of fact raised which was required to be submitted to a jury by Code Civ. Proc. § 1800, it was the duty of the court in the exercise of its discretion to examine all the averments of the petition, proof, and authority offered in support of the application with the same care as though it were called on to pass judgment of dissolution.

3. GAS—CORPORATIONS—USE OF STREETS—PROPERTY RIGHTS.

Where an act incorporating a gas company in the city of New York provided that no public street should be injured without permission of the city first obtained, a license by the city to use the streets vested in the corporation a perpetual property in the lands constituting the city streets, which could be taken from it only for cause by due process of law.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 24, Gas, § 2.]

4. SAME—TERM OF CORPORATE EXISTENCE—LICENSES.

Where certain gas companies organized to furnish gas in the city of New York were required to obtain licenses from the city to use the streets, and licenses granted were limited to various terms, such limitations should be construed as limiting the time within which the corporation could open the streets in the original placing of its works, and had no effect on the life of the corporation.

5. MUNICIPAL CORPORATIONS—USE OF STREETS—CONSENT OF MUNICIPALITY.

The Legislature has power to grant a corporation a franchise to use the streets of a city, without requiring the corporation to obtain the consent of the local authorities.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 36, Municipal Corporations, §§ 175, 1432.]

6. GAS—MAINTENANCE OF PLANT—LICENSES.

Where certain gas companies were incorporated to furnish gas to the city of New York, a provision that no public street should be dug into, etc., without permission of the city, constituted a mere gratuitous delegation of authority to the municipal body to control the time, manner, and method for, in, and by which its streets might be opened, and did not restrict the corporation's power to lay gas pipes in the street.

7. COURTS—STATE AND FEDERAL COURTS—COMITY.

Where the validity of the franchises of certain gas companies was pending in the federal courts on the report of a master, the state court, in recognition of comity, should restrain an action by the Attorney General

to dissolve such corporations, involving the validity of the franchises, until final adjudication by the federal courts.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 13, Courts, §§ 1346–1354.]

**8. CORPORATIONS—CORPORATE EXISTENCE—TIME LIMIT—PROPERTY RIGHTS.**

The fact that a corporation's life was limited to a specified period would not necessarily affect its rights to acquire property, in the enjoyment of which its successors and assigns would be protected, and the title to which would not expire with the life of the corporation.

**9. SAME—EXTENSION—POWER OF LEGISLATURE.**

It is within the power of the Legislature to extend the life of a public service corporation, if necessary.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 12, Corporations, § 105.]

**10. MONOPOLIES—CONSOLIDATION OF CORPORATIONS.**

Laws 1897, p. 310, c. 383, and Laws 1899, p. 1514, c. 690, prohibiting monopolies, are little more than a mere codification of the common law on such subject, and do not prohibit the consolidation of public service gas companies by the purchase of stock, as authorized by Stock Corporation Law, Laws 1892, p. 1834, c. 688, § 40, and section 58 (Laws 1896, p. 996, c. 932, as amended by Laws 1900, p. 1151, c. 476).

**11. STATUTES—REPEAL.**

Anti-Monopoly Act, Laws 1899, p. 1514, c. 690, did not repeal Stock Corporation Law, Laws 1892, p. 1834, c. 688, § 40, authorizing stock corporations to acquire stock in other corporations engaged in a similar business, on the theory that Laws 1899, p. 1514, c. 690, was subsequently enacted, and was expressive of the public policy of the state repugnant to the earlier statute; section 40 of the stock corporation law having been subsequently re-enacted by Laws 1902, p. 1751, c. 601.

**12. CORPORATIONS—CONSOLIDATION—MONOPOLIES.**

Where several consolidated corporations organized to furnish gas to the city of New York did not enjoy an exclusive privilege, and the price was within the control of the state, the consolidation of such corporations by the purchase of stock as authorized by Stock Corporation Law, Laws 1892, p. 1834, c. 688, § 40, and section 58 (Laws 1896, p. 996, c. 932, as amended by Laws 1900, p. 1151, c. 476), was not an abuse of corporate power detrimental to the public, nor a violation of Anti-Monopoly Act, Laws 1899, p. 1514, c. 690.

Application by the Attorney General for leave to commence an action against the Consolidated Gas Company of New York to terminate its corporate existence, on the ground that its charter had expired and that it was also guilty of a violation of the acts prohibiting monopolies. Application denied.

Wm. S. Jackson, Atty. Gen. (W. A. De Ford, of counsel), for relator.

Sherman & Sterling (Jas. M. Beck, John A. Garver, and Charles F. Mathewson, of counsel), for respondent.

McCALL, J. In the year 1884, by an instrument in writing duly executed, and dated September 27th of that year, and filed in the clerk's office of the county of New York and in the office of the Secretary of State at Albany on the 10th day of November, 1884, the following duly chartered companies, existing and doing business under general or special laws of this state in the manufacturing business of making and distributing gas, to wit, the New York Gaslight Company, the Manhattan Gaslight Company, the Metropolitan Gaslight Company of the City of New York, the Municipal Gaslight Company of the City

of New York, the Knickbocker Gaslight Company, and the Harlem Gaslight Company, agreed to a consolidation of their different enterprises in accordance with the terms and provisions of an act entitled "An act to authorize the consolidation of manufacturing corporations," and known as chapter 367, p. 448, of the Laws of 1884. From that date down to the present time the various business that had been theretofore conducted by the several distinct entities above named was continued by the amalgamated companies under the name and title of the "Consolidated Gas Company of New York. And now comes the Attorney General of the state, petitioning the court for its permission, the granting of which rests in its discretion (sections 1798 and 1799 of the Code), to commence an action on behalf of the people of the state against the Consolidated Gas Company for the purpose of procuring a judgment annulling the existence of said corporation, and further decreeing that the franchises of the constituent companies above named have ceased, terminated, and expired, and further decreeing that said Consolidated Gas Company is not the owner of, and has no right, title, or interest in or to, the franchises or rights or privileges conferred by or pretended to have been conferred by chapter 944, p. 2168, of the Laws of 1871, and ousting said corporation from the use of the franchises, which he claims have expired, and of the franchises which he contends it does not own and is not entitled to use, and perpetually enjoining said corporation from using the same and from exercising the rights and privileges which were conferred thereby, and, further, if such leave be extended, that permission be vouchsafed the Attorney General to lay the venue for the trial of the action in a county of his own selection. As a basis for his application he asserts that the corporation he complains of has, first, offended against the provisions of the acts under which it was created and under which its constituent companies were created; second, violated provisions of law and abused its corporate powers; third, exercised privileges and franchises not conferred upon it by law.

It will thus be seen at a glance that what is sought to be accomplished in such a proceeding is the extinguishment of the corporate life of this company, a penalty which, if successfully invoked, has been fittingly denominated the "extreme rigor of the law." The lawmaking power of the state itself, impressed with the momentous character of this proceeding and with the necessity of guarding and protecting its own creations against whimsical, unwise, or precipitate litigation in suits of this nature, has enacted that they can only be instituted by the Attorney General when he is directed to do so by the Legislature or by obtaining leave of the court (sections 1797, 1798, 1799 of the Code). The caution, deliberation, and careful scrutiny with which the courts must proceed when called upon to pronounce judicial execution of corporate life is best shown by quoting some extracts from the opinion of the Court of Appeals. Judge Finch, writing in People v. North River Sugar Refining Co., 121 N. Y. 582, 24 N. E. 834, 9 L. R. A. 33, 18 Am. St. Rep. 843, therein says:

"Its infliction [corporate death] must rest upon grave causes and be warranted by material misconduct." Its life "may not be destroyed without clear and abundant reason," and when the state summons a defendant to a judicial

tribunal for the infliction of corporate death "by that process it assumes the burden of establishing the charges it has made, and must show its warrant in facts for the relief which it seeks. * * * It must show on the part of the corporation accused some sin against the law of its being which has produced or tends to produce injury to the public." The transgression must not "be merely formal or incidental, but material and serious, and such as to harm or menace the public welfare."

It might be said that this applies with particular force to the safeguards and protection that should hedge about the actual trial of the issues after the same had begun, but has little adaptation to the present motion, where leave is sought merely to institute such proceedings, wherein it must be conceded that it is the policy of the law to clothe the petitioner with the administrative duty of determining whether the public interests are to be conserved by instituting such an action. But, as in the case at bar, where practically no issue of fact is raised which, under section 1800 of the Code, would call for the determination of the jury, and seemingly nothing remains to be decided but pure questions of law, it behooves the court, and is incumbent upon it as a solemn duty, to examine into all of the averments of the petition and the proof and authority offered in support thereof with a like degree of care as though it were called upon to pass judgment of dissolution, and, concluding as to that, frame his determination in the exercise of his judicial duty on the question of granting the leave to precipitate the suit as the equities and justice of the case demand. In its last analysis the gravamen of the charges against the company is based upon the following alleged facts: First. That the charter and its corporate life has long since terminated by expiring under the limitations placed thereon by the life-giving power, and hence by its present continuance in business it is exercising powers not conferred by law, and has therefore offended against the act under which it was created and under which its several constituent companies were created. Second. That since the amalgamation of the several companies the Consolidated Company has purchased stock in kindred gas and electric light companies with the intent and effect of creating a monopoly therein, whereby it is asserted it has violated and offended against the law in an abuse of its corporate powers.

As to the condition presented under the first charge, whatever rights of property, privileges, franchises, and interests these constituent companies had under their individual incorporations, or which they duly and regularly became possessed of by purchase or other acquisition in due legal form, and to which they were rightfully entitled at the time of amalgamation, passed under the provisions of the act and the terms of the agreement to the Consolidated Company, and as to this proposition there neither is nor can be any serious cavil or dispute. Each of the several constituent companies had their being from the sovereign power of the state by either special act of legislation or through the authority conferred by general laws. And in but one instance, viz., the Harlem Gaslight Company, can there be found even a suggestion of limitation upon the corporate life created thereunder by which death through expiration can now be claimed, and in this instance of exception, while its certificate of incorporation under the general laws,

dated February 1, 1885, provided that the term of its existence should be 50 years, the provisions of the grant by the city to said company (to be treated more fully hereafter) is absolutely without limitation of any kind. It is true that in the several acts of the Legislature by which these different constituent companies came into being there is to be found a clause reading generally as follows:

"Provided that no public street, lane or highway in the city of New York shall be dug into or in any wise injured or defaced without the permission of the corporation of said city first had and obtained."

It is equally true that in every instance when it was incumbent upon them to do so each of said corporations made the necessary application and the same was granted by the municipal authority. What the local government bestowed by its act has been construed and designated variously. Taken by itself, as a mere license or privilege (City of Brooklyn v. Jourdan, 7 Abb. N. C. 23); then, again, something more than a grant of a mere license or permit—a franchise to lay its mains and lines to deliver its product (People ex rel. Woodhaven Co. v. Deehan, 11 App. Div. 176, 42 N. Y. Supp. 1071, approved by Court of Appeals in Ghee v. Northern Union Gas Co., 158 N. Y. 510, 53 N. E. 692). In construing the character °of the municipal authorities act in granting similar permission under the transportation corporation act, call it by whatever title you will, license, permit, privilege, or give it the greater dignity of franchise, when it is once extended, it vests in the corporation receiving it a perpetual property in the lands constituting the streets of the municipality, to be taken from it only for cause and by due legal process.

But what about the limit of time definitely fixed in these municipal acts, to wit, in the case of the New York Gaslight Company and the Manhattan Gaslight Company, fixed, respectively, as ending May 12, 1853; the Metropolitan as ending not later than December 22, 1888; the Municipal Gaslight Company as ending not later than March 22, 1907? They are without significance in any degree as bearing upon the corporative life of these companies. If there is any substance at all in their so fixing definite periods of limitation, in my judgment it is only possible to find it when viewing it as determining for what period of time (once giving its consent) they will allow the streets to be "dug into," without any reference or bearing whatsoever on the question of future maintenance or operation of the plant once installed and established within the limit of time fixed by its consent to open the streets in the original placing. That is the full extent and effect to be spelled out of such limitation. That was all that was intended, and if aught else was sought to be established it was a nullity, and the attempt is void. Otherwise note the condition that would be wrought. An inferior local legislature (one in fact having its being from the same source), the aldermen or common council of a city, might by their act abridge the life of a corporation created by the sovereign power of the state, which by its act or creation placed no limitation on the existence of the body it gave life to. To emphasize the absurdity of such a proposition, take the case of one of the constituent companies with a definite and fixed period of existence, grant-

ed by the law of the state under which it was incorporated—the Municipal Gas Company—with a life of 50 years. It applies for the necessary leave "to ·dig into the streets," and it is granted, say, for 20 years. Would any one seriously contend that such a limitation by the local authorities shortened the chartered life vouchsafed by the sovereign power, so that it would legally die 30 years before the time fixed for its expiration by the laws of the state? Still, that is precisely what the petitioner contends for herein; for unless the local grants place a limitation upon the corporate existence its lease of life is concededly perpetual, and therefore it is not exercising powers not conferred by law, and is not offending against the act under which it or its constituent companies were created. If this power is not resident in the local authorities, why did the sovereign power refer its creatures to it to secure the privilege the obtaining of which is seemingly a prerequisite to the transaction of business? Was the consent of the local authorities necessary to the perfection of authority on the part of the state to act? No. It has in many instances granted these franchises directly to the corporation without the consent of the local authorities. See franchises to East River Gas Company of Long Island City by chapter 338, p. 693, Laws of 1892; and state grant in chapter 944, p. 2168, of Laws of 1871. Was it because of any recognized ownership or dominion over the streets as would permit the city to bestow any such privilege? Certainly not; because none existed, except as in so far as the sovereign power had referred the applicant to it for such consent. City of Brooklyn v. Jourdan, 7 Abb. N. C. 23. It was a purely gratuitous delegation of authority to said municipal body to control the time, manner, and method when and in and by which its streets might be "dug into" to accomplish that which the sovereign power—not the local authority—said could be done by these corporations, to wit, "lay pipes for the purpose of conducting gas in any part of the streets," etc.

The wisdom, necessity, and farsightedness of such provision in chartering grants of this character appeals with peculiar force to one when he contemplates the havoc, confusion, and detriment to public welfare and interests the unrestrained, uncontrolled acts of opening our streets without right of local regulations and the power to impose conditions as to all three of these features would certainly work. To such an extent the provisions calling for local consent as a prerequisite appeals to reason and is sound; but any interpretation or construction extending it beyond that, and to the extent of giving the local authorities any right to limit the life of a corporation, becomes illogical and unphilosophical, without reason or justification. Even the long period of time fixed in these local grants for the exercise of the rights vouchsafed by their consent, namely, 20 and 30 years, affords no argument that such consent runs rather to maintenance of plant and the operation of franchise rights than to the mere installation of the plant. Take the time of granting of some, as far back as 1823. It was not to be supposed that the enormous plant of the corporation or of its constituent parts, embracing as it now does the entire present street area of these two boroughs of Manhattan and the Bronx, would at the time of granting the consent be immediately laid, not only in the

then existing part of the city, but also in that subsequently developed (then in prospective only), for such grants are comprehensive enough to embrace both (People ex rel. Woodhaven Co. v. Deehan, 153 N. Y. 528, 47 N. E. 787), but rather that its development would be slow, meeting the present needs, growing contemporaneously with the city's development, and as new streets, avenues, etc., were opened and houses built thereon and occupied, and demands for service made, the company would respond to meet the obligations its franchise from the state imposed, the original grant from the city obviating the necessity for a fresh application for leave to open the streets as the work for laying mains therein progressed, and this proceeding necessarily involved a long period of years. Can it be gainsaid that this is the view that both local and state authorities took of what these rights consisted? If yes, then where are we to look for tangible explanation of why the raising of the question has been so long delayed? For it must be borne in mind that this awakening has not come on the eve of any expiration of life, and if there is any vigor in this contention of limitation it was enforceable 20, 30, yes, 50, years ago, and rather lacks merit now, when, even assuming that the company utterly failed to show a compliance with the provisions of its charter or of the charter of the several constituent companies requiring the application to be made to the local authorities, they could rely upon enforcement of full rights and privileges by implied consent through acquiescence. People ex rel. N. Y. & Richmond Gas Co. v. Cromwell, 89 App. Div. 291, 85 N. Y. Supp. 878.

I do not think there is need for further elaboration on this point beyond referring to the fact that this precise question is now before the federal courts of the United States upon the report of a master, who has stated to the Circuit Court of the United States, after an examination into the merits, that these franchises are valid and existing; and while I am not prepared to accept—res adjudicata—by force of that report, I would without hesitation restrain any action on this question until the final adjudication by the federal courts in recognition of the comity that should exist under such circumstances, as recently splendidly presented by the Appellate Divisions of the First and Second Departments of this state.

As to the question presented by the expiration of the 50-year period, for which by its certificate the Harlem Gaslight Company was to exist, that fact would not necessarily affect its rights to acquire property in the enjoyment of which its successors and assigns should be protected, and the title to these rights would not expire with the life of the corporation. Detroit v. Detroit Citizens' Ry., 184 U. S. 368, 22 Sup. Ct. 410, 46 L. Ed. 592. It is within the power of the Legislature to extend the life of this company if it is necessary, and such corporations rarely end by the flowing out of their time. Miner v. N. Y. C. R. R., 123 N. Y. 242, 25 N. E. 339. That the rights of said company did not run to its assignors cannot now be urged in view of the act under which the consolidation was permitted. But if any question possibly exists it will undoubtedly receive full attention at the hands of those most interested, as to this phase of the matter the local authorities, who already through the corporation counsel, by in-

stitution of suit, have brought the subject of these franchises to the court's attention.

Now, as to the charge of abusing corporate powers, arising out of the purchase of stock of kindred companies, with the intent and effect, as claimed, of creating monopolies in the sale and distribution of gas and electricity. That the Consolidated Company has acquired by purchase the stocks of these companies named in the petition is conceded, but it asserts statutory authority for its transactions. Section 40 of the stock corporation law (Laws 1892, p. 1834, c. 688) not only authorizes a stock corporation to purchase and acquire the stock of a corporation engaged in a similar business, or with which it is authorized to consolidate, and issue its own stocks and bonds in exchange therefor, but it goes further and provides that the officers of the acquiring company are eligible as directors in the company whose stock has been acquired, and the corporation itself may exercise all the rights, etc., of an individual stockholder. And no limitation is placed upon the amount of stock that may thus be acquired by a kindred company up to the very last share, when merger may follow. Section 58, Stock Corporation Law (Laws 1896, p. 996, c. 932, as amended by Laws 1900, p. 1151, c. 476). And though as a result of the purchase of the stock or the consolidation there arises an interference with competition, even then it is not to be discountenanced, but seems to have met with legal sanction, even when the precise ground or reason for purchase was openly asserted to be an effort to prevent ruinous competition. Rafferty v. Buffalo City Gas Co., 37 App. Div. 618, 56 N. Y. Supp. 288. And the presentation of the so-called anti-monopoly law in opposition and as prohibiting is of no force, first, because it cannot be applied and has no bearing on the transactions of which the petitioner complains. The two so-called anti-monopoly statutes have been declared to be little more than mere codification of the common law upon the subject (Matter of Davies, 168 N. Y. 89, 61 N. E. 118, 56 L. R. A. 855), and there is nothing to be found in the later act to affect or limit the statutory provisions authorizing corporations to acquire stock as referred to foregoing, and therefore these provisions continue in force unimpaired, and while they do so one corporation may acquire the stock of another engaged in similar business to the full extent of the power granted, with all the consequences it necessarily involves. And by no construction will there be imported into a statute an inhibition or limitation which is not found within the plain purport thereof. Trenton Potteries Co. v. Oliphant, 58 N. J. Eq. 507–524, 43 Atl. 723, 46 L. R. A. 255, 78 Am. St. Rep. 612.

But we are not left to initiative assertion on this application that this anti-monopoly law has no application, because the case of Rafferty v. Buffalo City Gas Co., supra, was decided in February, 1899, and there was in existence then the anti-monopoly act of 1897 (chapter 383, p. 310, Laws 1897), which was substantially identical in every provision with chapter 690, p. 1514, of the Laws of 1899, differing only therefrom in the method of procedure to be followed thereunder. Consequently, when the Appellate Division in that case gave legal sanction and approval to such transactions, it must have determined that the same did not conflict with the provisions of this statute. It

cannot be said that chapter 690 of the Laws of 1899 repealed section 40 of the stock corporation law (it having been enacted seven years later) as being expressive of public policy repugnant of that expressed in the earlier statute of 1892, because section 40 of the stock corporation law was re-enacted word for word by chapter 601, p. 1751, of the Laws of 1902, three years after the latest anti-monopoly act of 1899, and after the effect of the same on such transactions had been practically interpreted and determined in Rafferty v. City of Buffalo, supra. What is there in these transactions that transgresses the law against the creation, establishment, or maintenance of monopolies? It is not to be seen anywhere that there is vouchsafed to this company any feature of exclusiveness in the field of its operations. It is wide open to competition, save as the state holds control (section 11, c. 737, p. 2096, Laws 1905), and as I recall on oral argument it was asserted without challenge that as a matter of fact this county of New York is one of few, if not the only one, where rivalry actually does exist through separate and independent companies doing business. It cannot be pointed out in the possession of any powers it has to limit the supply, because it is a public service corporation, and it must supply to any and all who demand its product and will pay therefor; and, right here, can the supply be controlled by making the price prohibitive? No; for the company practically has no voice in either. The state will compel service, and it controls the price to be charged, and fixes the same, even to the point where the company may be compelled to seek the protection of the courts against asserted confiscation. Consol. Co. v. Mayer et al., now pending in United States Circuit Court, Southern District of New York. See 146 Fed. 150. The anti-monopoly act is really aimed at combinations between independent concerns for the purpose of regulating prices and production, and what is abhorrent and repugnant to the statute are contracts, agreements, arrangements, or combinations which tend toward a control of the sale or production of a thing of common use, and so prevent competition in supply or price. Cohen v. Envelope Co., 166 N. Y. 292, 59 N. E. 906; Cummings v. Stone, 164 N. Y. 401, 58 N. E. 525, 52 L. R. A. 262, 79 Am. St. Rep. 655; People v. Milk Exchange, 145 N. Y. 267, 39 N. E. 1062, 27 L. R. A. 437, 45 Am. St. Rep. 609; People v. Sheldon, 139 N. Y. 251, 34 N. E. 785, 23 L. R. A. 221, 36 Am. St. Rep. 690. No such condition is presented in these transactions. What is shown is an out and out purchase of stock from legal holders. The purchaser being a corporation, the sale is made under statutory permission, and is not a contract, agreement, arrangement, or combination within the provisions of the anti-monopoly act. Diamond Match Co. v. Roeber, 106 N. Y. 483, 13 N. E. 419, 60 Am. Rep. 464.

It is therefore impossible to see where there is any "warrant in facts" presented that would justify the granting of this leave prayed for. The record is destitute of any proof to show this corporation guilty of any "material or serious transgression or misconduct" which would tend to "harm or menace the public welfare." Its franchise rights are valid and existing. Whatever may be my personal opinion as to the wisdom or soundness of the policy of the state expressed in laws that gives this permission to these corporations to make such unlimited

or unconditional purchase of stock of kindred corporations, even to the extent of working a merger, I have no right to intrude upon this application with an expression of the same, and I am not to allow it to control or swerve me for a moment in determining this application. The statutes are upon our books, and the duty of the court is to interpret and apply, not to enact, legislation. Whatever this company, therefore, did in the purchase of these stocks of kindred corporations, was done under valid existing legislation, which has been given judicial sanction, and the same does not constitute an abuse of corporate powers that would call for a revocation of its charter. To use a homely simile in illustration of the nature of the application in reference to this particular feature, it would be as though a child, having sought and received a parent's permission to do a certain thing, and then feeling that the permission thus granted was in conflict with other orders and directions of the parent previously given, went to him and called his attention to the same. Thereupon the father, reiterating the permission, instructed the child and relieved him of his doubt, and then, he doing precisely what the permission originally granted and under the approbation, if not the guidance and instruction, of the parent, the parent would seek authority to strangle his offspring for the act he directed the child to perform and approved of his doing. If that is not precisely what this application is the equivalent of, I am greatly in error.

The motion is denied. Settle order on notice.